# HIRABAYASHI v. UNITED STATES.

No. 870.   Argued May 10, 11, 1943.—Decided June 21, 1943.

*Messrs. Frank L. Walters* and *Harold Evans*, with whom *Messrs. Osmond K. Fraenkel, Arthur G. Barnett, Edwin M. Borchard, Brien McMahon,* and *William Draper Lewis* were on the brief (*Mr. Alfred J. Schweppe* entered an appearance), for Hirabayashi.

*Solicitor General Fahy*, with whom *Messrs. Edward J. Ennis, Arnold Raum, John L. Burling,* and *Leo Gitlin* were on the brief, for the United States.

Briefs of *amici curiae* were filed by *Messrs. Arthur Garfield Hays, Osmond K. Fraenkel,* and *A. L. Wirin* on behalf

of the American Civil Liberties Union; by *Mr. A. L. Wirin* on behalf of the Japanese American Citizens League; and by *Mr. Jackson H. Ralston* on behalf of the Northern California Branch of the American Civil Liberties Union,—in support of Hirabayashi; and by *Messrs. Robert W. Kenny,* Attorney General of California, *I. H. Van Winkle,* Attorney General of Oregon, *Smith Troy,* Attorney General of the State of Washington, and *Fred E. Lewis,* Chief Assistant and Acting Attorney General of the State of Washington, on behalf of those States,—urging affirmance.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

Appellant, an American citizen of Japanese ancestry, was convicted in the district court of violating the Act of Congress of March 21, 1942, 56 Stat. 173, which makes it a misdemeanor knowingly to disregard restrictions made applicable by a military commander to persons in a military area prescribed by him as such, all as authorized by an Executive Order of the President.

The questions for our decision are whether the particular restriction violated, namely that all persons of Japanese ancestry residing in such an area be within their place of residence daily between the hours of 8:00 p. m. and 6:00 a. m., was adopted by the military commander in the exercise of an unconstitutional delegation by Congress of its legislative power, and whether the restriction unconstitutionally discriminated between citizens of Japanese ancestry and those of other ancestries in violation of the Fifth Amendment.

The indictment is in two counts. The second charges that appellant, being a person of Japanese ancestry, had on a specified date, contrary to a restriction promulgated by the military commander of the Western Defense Command, Fourth Army, failed to remain in his place of resi-

dence in the designated military area between the hours of 8:00 o'clock p. m. and 6:00 a. m. The first count charges that appellant, on May 11 and 12, 1942, had, contrary to a Civilian Exclusion Order issued by the military commander, failed to report to the Civil Control Station within the designated area, it appearing that appellant's required presence there was a preliminary step to the exclusion from that area of persons of Japanese ancestry.

By demurrer and plea in abatement, which the court overruled (46 F. Supp. 657), appellant asserted that the indictment should be dismissed because he was an American citizen who had never been a subject of and had never borne allegiance to the Empire of Japan, and also because the Act of March 21, 1942, was an unconstitutional delegation of Congressional power. On the trial to a jury it appeared that appellant was born in Seattle in 1918, of Japanese parents who had come from Japan to the United States, and who had never afterward returned to Japan; that he was educated in the Washington public schools and at the time of his arrest was a senior in the University of Washington; that he had never been in Japan or had any association with Japanese residing there.

The evidence showed that appellant had failed to report to the Civil Control Station on May 11 or May 12, 1942, as directed, to register for evacuation from the military area. He admitted failure to do so, and stated it had at all times been his belief that he would be waiving his rights as an American citizen by so doing. The evidence also showed that for like reason he was away from his place of residence after 8:00 p. m. on May 9, 1942. The jury returned a verdict of guilty on both counts and appellant was sentenced to imprisonment for a term of three months on each, the sentences to run concurrently.

On appeal the Court of Appeals for the Ninth Circuit certified to us questions of law upon which it desired in-

structions for the decision of the case. See § 239 of the Judicial Code as amended, 28 U. S. C. § 346. Acting under the authority conferred upon us by that section we ordered that the entire record be certified to this Court so that we might proceed to a decision of the matter in controversy in the same manner as if it had been brought here by appeal. Since the sentences of three months each imposed by the district court on the two counts were ordered to run concurrently, it will be unnecessary to consider questions raised with respect to the first count if we find that the conviction on the second count, for violation of the curfew order, must be sustained. *Brooks* v. *United States*, 267 U. S. 432, 441; *Gorin* v. *United States*, 312 U. S. 19, 33.

The curfew order which appellant violated, and to which the sanction prescribed by the Act of Congress has been deemed to attach, purported to be issued pursuant to an Executive Order of the President. In passing upon the authority of the military commander to make and execute the order, it becomes necessary to consider in some detail the official action which preceded or accompanied the order and from which it derives its purported authority.

On December 8, 1941, one day after the bombing of Pearl Harbor by a Japanese air force, Congress declared war against Japan. 55 Stat. 795. On February 19, 1942, the President promulgated Executive Order No. 9066. 7 Federal Register 1407. The Order recited that "the successful prosecution of the war requires every possible protection against espionage and against sabotage to national-defense material, national-defense premises, and national-defense utilities as defined in Section 4, Act of April 20, 1918, 40 Stat. 533, as amended by the Act of November 30, 1940, 54 Stat. 1220, and the Act of August 21, 1941, 55 Stat. 655." By virtue of the authority vested

in him as President and as Commander in Chief of the Army and Navy, the President purported to "authorize and direct the Secretary of War, and the Military Commanders whom he may from time to time designate, whenever he or any designated Commander deems such action necessary or desirable, to prescribe military areas in such places and of such extent as he or the appropriate Military Commander may determine, from which any or all persons may be excluded, and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War or the appropriate Military Commander may impose in his discretion."

On February 20, 1942, the Secretary of War designated Lt. General J. L. DeWitt as Military Commander of the Western Defense Command, comprising the Pacific Coast states and some others, to carry out there the duties prescribed by Executive Order No. 9066. On March 2, 1942, General DeWitt promulgated Public Proclamation No. 1. 7 Federal Register 2320. The proclamation recited that the entire Pacific Coast "by its geographical location is particularly subject to attack, to attempted invasion by the armed forces of nations with which the United States is now at war, and, in connection therewith, is subject to espionage and acts of sabotage, thereby requiring the adoption of military measures necessary to establish safeguards against such enemy operations." It stated that "the present situation requires as a matter of military necessity the establishment in the territory embraced by the Western Defense Command of Military Areas and Zones thereof"; it specified and designated as military areas certain areas within the Western Defense Command; and it declared that "such persons or classes of persons as the situation may require" would, by subsequent proclamation, be excluded from certain of these

areas, but might be permitted to enter or remain in certain others, under regulations and restrictions to be later prescribed. Among the military areas so designated by Public Proclamation No. 1 was Military Area No. 1, which embraced, besides the southern part of Arizona, all the coastal region of the three Pacific Coast states, including the City of Seattle, Washington, where appellant resided. Military Area No. 2, designated by the same proclamation, included those parts of the coastal states and of Arizona not placed within Military Area No. 1.

Public Proclamation No. 2 of March 16, 1942, issued by General DeWitt, made like recitals and designated further military areas and zones. It contained like provisions concerning the exclusion, by subsequent proclamation, of certain persons or classes of persons from these areas, and the future promulgation of regulations and restrictions applicable to persons remaining within them. 7 Federal Register 2405.

An Executive Order of the President, No. 9102, of March 18, 1942, established the War Relocation Authority, in the Office for Emergency Management of the Executive Office of the President; it authorized the Director of War Relocation Authority to formulate and effectuate a program for the removal, relocation, maintenance and supervision of persons designated under Executive Order No. 9066, already referred to; and it conferred on the Director authority to prescribe regulations necessary or desirable to promote the effective execution of the program. 7 Federal Register 2165.

Congress, by the Act of March 21, 1942, provided: "That whoever shall enter, remain in, leave, or commit any act in any military area or military zone prescribed, under the authority of an Executive order of the President, by the Secretary of War, or by any military commander designated by the Secretary of War, contrary to the restrictions applicable to any such area or zone or contrary

to the order of the Secretary of War or any such military commander, shall, if it appears that he knew or should have known of the existence and extent of the restrictions or order and that his act was in violation thereof, be guilty of a misdemeanor and upon conviction shall be liable" to fine or imprisonment, or both.

Three days later, on March 24, 1942, General DeWitt issued Public Proclamation No. 3. 7 Federal Register 2543. After referring to the previous designation of military areas by Public Proclamations Nos. 1 and 2, it recited that ". . . the present situation within these Military Areas and Zones requires as a matter of military necessity the establishment of certain regulations pertaining to all enemy aliens and all persons of Japanese ancestry within said Military Areas and Zones ... ." It accordingly declared and established that from and after March 27, 1942, "all alien Japanese, all alien Germans, all alien Italians, and all persons of Japanese ancestry residing or being within the geographical limits of Military Area No. 1 . . . shall be within their place of residence between the hours of 8:00 P. M. and 6:00 A. M., which period is hereinafter referred to as the hours of curfew." It also imposed certain other restrictions on persons of Japanese ancestry, and provided that any person violating the regulations would be subject to the criminal penalties provided by the Act of Congress of March 21, 1942.

Beginning on March 24, 1942, the military commander issued a series of Civilian Exclusion Orders pursuant to the provisions of Public Proclamation No. 1. Each such order related to a specified area within the territory of his command. The order applicable to appellant was Civilian Exclusion Order No. 57 of May 10, 1942. 7 Federal Register 3725. It directed that from and after 12:00 noon, May 16, 1942, all persons of Japanese ancestry, both alien and nonalien, be excluded from a specified portion of Military Area No. 1 in Seattle, including appellant's place of residence,

and it required a member of each family; and each individual living alone, affected by the order to report on May 11 or May 12 to a designated Civil Control Station in Seattle. Meanwhile the military commander had issued Public Proclamation No. 4 of March 27, 1942, which recited the necessity of providing for the orderly evacuation and resettlement of Japanese within the area, and prohibited all alien Japanese and all persons of Japanese ancestry from leaving the military area until future orders should permit. 7 Federal Register 2601.

Appellant does not deny that he knowingly failed to obey the curfew order as charged in the second count of the indictment, or that the order was authorized by the terms of Executive Order No. 9066, or that the challenged Act of Congress purports to punish with criminal penalties disobedience of such an order. His contentions are only that Congress unconstitutionally delegated its legislative power to the military commander by authorizing him to impose the challenged regulation, and that, even if the regulation were in other respects lawfully authorized, the Fifth Amendment prohibits the discrimination made between citizens of Japanese descent and those of other ancestry.

It will be evident from the legislative history that the Act of March 21, 1942, contemplated and authorized the curfew order which we have before us. The bill which became the Act of March 21, 1942, was introduced in the Senate on March 9th and in the House on March 10th at the request of the Secretary of War who, in letters to the Chairman of the Senate Committee on Military Affairs and to the Speaker of the House, stated explicitly that its purpose was to provide means for the enforcement of orders issued under Executive Order No. 9066. This appears in the committee reports on the bill, which set out in full the Executive Order and the Secretary's letter. 88 Cong. Rec. 2722, 2725; H. R. Rep. No. 1906, 77th Cong.,

2d Sess.; S. Rep. No. 1171, 77th Cong., 2d Sess. And each of the committee reports expressly mentions curfew orders as one of the types of restrictions which it was deemed desirable to enforce by criminal sanctions.

When the bill was under consideration, General DeWitt had published his Proclamation No. 1 of March 2, 1942, establishing Military Areas Nos. 1 and 2, and that Proclamation was before Congress. S. Rep. No. 1171, 77th Cong., 2d Sess., p. 2; see also 88 Cong. Rec. 2724. A letter of the Secretary to the Chairman of the House Military Affairs Committee, of March 14, 1942, informed Congress that "General DeWitt is strongly of the opinion that the bill, when enacted, should be broad enough to enable the Secretary of War or the appropriate military commander to enforce curfews and other restrictions within military areas and zones"; and that General DeWitt had "indicated that he was prepared to enforce certain restrictions at once for the purpose of protecting certain vital national defense interests but did not desire to proceed until enforcement machinery had been set up." H. R. Rep. No. 1906, 77th Cong., 2d Sess., p. 3. See also letter of the Acting Secretary of War to the Chairman of the Senate Military Affairs Committee, March 13, 1942, 88 Cong. Rec. 2725.

The Chairman of the Senate Military Affairs Committee explained on the floor of the Senate that the purpose of the proposed legislation was to provide means of enforcement of curfew orders and other military orders made pursuant to Executive Order No. 9066. He read General DeWitt's Public Proclamation No. 1, and statements from newspaper reports that "evacuation of the first Japanese aliens and American-born Japanese" was about to begin. He also stated to the Senate that "reasons for suspected widespread fifth-column activity among Japanese" were to be found in the system of dual citizenship which Japan deemed applicable to American-

born Japanese, and in the propaganda disseminated by Japanese consuls, Buddhist priests and other leaders, among American-born children of Japanese. Such was stated to be the explanation of the contemplated evacuation from the Pacific Coast area of persons of Japanese ancestry, citizens as well as aliens. 88 Cong. Rec. 2722–26; see also pp. 2729–30. Congress also had before it the Preliminary Report of a House Committee investigating national defense migration, of March 19, 1942, which approved the provisions of Executive Order No. 9066, and which recommended the evacuation, from military areas established under the Order, of all persons of Japanese ancestry, including citizens. H. R. Rep. No. 1911, 77th Cong., 2d Sess. The proposed legislation provided criminal sanctions for violation of orders, in terms broad enough to include the curfew order now before us, and the legislative history demonstrates that Congress was advised that curfew orders were among those intended, and was advised also that regulation of citizen and alien Japanese alike was contemplated.

The conclusion is inescapable that Congress, by the Act of March 21, 1942, ratified and confirmed Executive Order No. 9066. *Prize Cases,* 2 Black 635, 671; *Hamilton* v. *Dillin,* 21 Wall. 73, 96–97; *United States* v. *Heinszen & Co.,* 206 U. S. 370, 382–84; *Tiaco* v. *Forbes,* 228 U. S. 549, 556; *Isbrandtsen-Moller Co.* v. *United States,* 300 U. S. 139, 146–48; *Swayne & Hoyt, Ltd.* v. *United States,* 300 U. S. 297, 300–03; *Mason Co.* v. *Tax Comm'n,* 302 U. S. 186, 208. And so far as it lawfully could, Congress authorized and implemented such curfew orders as the commanding officer should promulgate pursuant to the Executive Order of the President. The question then is not one of Congressional power to delegate to the President the promulgation of the Executive Order, but whether, acting in coöperation, Congress and the Executive have constitutional authority to impose the cur-

few restriction here complained of. We must consider also whether, acting together, Congress and the Executive could leave it to the designated military commander to appraise the relevant conditions and on the basis of that appraisal to say whether, under the circumstances, the time and place were appropriate for the promulgation of the curfew order and whether the order itself was an appropriate means of carrying out the Executive Order for the "protection against espionage and against sabotage" to national defense materials, premises and utilities. For reasons presently to be stated, we conclude that it was within the constitutional power of Congress and the executive arm of the Government to prescribe this curfew order for the period under consideration and that its promulgation by the military commander involved no unlawful delegation of legislative power.

Executive Order No. 9066, promulgated in time of war for the declared purpose of prosecuting the war by protecting national defense resources from sabotage and espionage, and the Act of March 21, 1942, ratifying and confirming the Executive Order, were each an exercise of the power to wage war conferred on the Congress and on the President, as Commander in Chief of the armed forces, by Articles I and II of the Constitution. See *Ex parte Quirin,* 317 U. S. 1; 25–26. We have no occasion to consider whether the President, acting alone, could lawfully have made the curfew order in question, or have authorized others to make it. For the President's action has the support of the Act of Congress, and we are immediately concerned with the question whether it is within the constitutional power of the national government, through the joint action of Congress and the Executive, to impose this restriction as an emergency war measure. The exercise of that power here involves no question of martial law or trial by military tribunal. Cf. *Ex parte Milligan,* 4 Wall. 2; *Ex parte Quirin, supra.* Appellant has been

tried and convicted in the civil courts and has been subjected to penalties prescribed by Congress for the acts committed.

The war power of the national government is "the power to wage war successfully." See Charles Evans Hughes, War Powers Under the Constitution, 42 A. B. A. Rep. 232, 238. It extends to every matter and activity so related to war as substantially to affect its conduct and progress. The power is not restricted to the winning of victories in the field and the repulse of enemy forces. It embraces every phase of the national defense, including the protection of war materials and the members of the armed forces from injury and from the dangers which attend the rise, prosecution and progress of war. *Prize Cases, supra; Miller* v. *United States,* 11 Wall. 268, 303–14; *Stewart* v. *Kahn,* 11 Wall. 493, 506–07; *Selective Draft Law Cases,* 245 U. S. 366; *McKinley* v. *United States,* 249 U. S. 397; *United States* v. *Macintosh,* 283 U. S. 605, 622–23. Since the Constitution commits to the Executive and to Congress the exercise of the war power in all the vicissitudes and conditions of warfare, it has necessarily given them wide scope for the exercise of judgment and discretion in determining the nature and extent of the threatened injury or danger and in the selection of the means for resisting it. *Ex parte Quirin, supra,* 28–29; cf. *Prize Cases, supra,* 670; *Martin* v. *Mott,* 12 Wheat. 19, 29. Where, as they did here, the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs.

The actions taken must be appraised in the light of the conditions with which the President and Congress were confronted in the early months of 1942, many of which,

since disclosed, were then peculiarly within the knowledge of the military authorities. On December 7, 1941, the Japanese air forces had attacked the United States Naval Base at Pearl Harbor without warning, at the very hour when Japanese diplomatic representatives were conducting negotiations with our State Department ostensibly for the peaceful settlement of differences between the two countries. Simultaneously or nearly so, the Japanese attacked Malaysia, Hong Kong, the Philippines, and Wake and Midway Islands. On the following day their army invaded Thailand. Shortly afterwards they sank two British battleships. On December 13th, Guam was taken. On December 24th and 25th they captured Wake Island and occupied Hong Kong. On January 2, 1942, Manila fell, and on February 10th Singapore, Britain's great naval base in the East, was taken. On February 27th the battle of the Java Sea resulted in a disastrous naval defeat to the United Nations. By the 9th of March Japanese forces had established control over the Netherlands East Indies; Rangoon and Burma were occupied; Bataan and Corregidor were under attack.

Although the results of the attack on Pearl Harbor were not fully disclosed until much later, it was known that the damage was extensive, and that the Japanese by their successes had gained a naval superiority over our forces in the Pacific which might enable them to seize Pearl Harbor, our largest naval base and the last stronghold of defense lying between Japan and the west coast. That reasonably prudent men charged with the responsibility of our national defense had ample ground for concluding that they must face the danger of invasion, take measures against it, and in making the choice of measures consider our internal situation, cannot be doubted.

The challenged orders were defense measures for the avowed purpose of safeguarding the military area in question, at a time of threatened air raids and invasion

by the Japanese forces, from the danger of sabotage and espionage. As the curfew was made applicable to citizens residing in the area only if they were of Japanese ancestry, our inquiry must be whether in the light of all the facts and circumstances there was any substantial basis for the conclusion, in which Congress and the military commander united, that the curfew as applied was a protective measure necessary to meet the threat of sabotage and espionage which would substantially affect the war effort and which might reasonably be expected to aid a threatened enemy invasion. The alternative which appellant insists must be accepted is for the military authorities to impose the curfew on all citizens within the military area, or on none. In a case of threatened danger requiring prompt action, it is a choice between inflicting obviously needless hardship on the many, or sitting passive and unresisting in the presence of the threat. We think that constitutional government, in time of war, is not so powerless and does not compel so hard a choice if those charged with the responsibility of our national defense have reasonable ground for believing that the threat is real.

When the orders were promulgated there was a vast concentration, within Military Areas Nos. 1 and 2, of installations and facilities for the production of military equipment, especially ships and airplanes. Important Army and Navy bases were located in California and Washington. Approximately one-fourth of the total value of the major aircraft contracts then let by Government procurement officers were to be performed in the State of California. California ranked second, and Washington fifth, of all the states of the Union with respect to the value of shipbuilding contracts to be performed.[1]

---

[1] State Distribution of War Supply and Facility Contracts—June 1940 through December 1941 (issued by Office of Production Management, Bureau of Research and Statistics, January 18, 1942); *Ibid.*—Cumulative through February 1943 (issued by War Production Board, Statistics Division, April 3, 1943).

In the critical days of March 1942, the danger to our war production by sabotage and espionage in this area seems obvious. The German invasion of the Western European countries had given ample warning to the world of the menace of the "fifth column." Espionage by persons in sympathy with the Japanese Government had been found to have been particularly effective in the surprise attack on Pearl Harbor.[2] At a time of threatened Japanese attack upon this country, the nature of our inhabitants' attachments to the Japanese enemy was consequently a matter of grave concern. Of the 126,000 persons of Japanese descent in the United States, citizens and non-citizens, approximately 112,000 resided in California, Oregon and Washington at the time of the adoption of the military regulations. Of these approximately two-thirds are citizens because born in the United States. Not only did the great majority of such persons reside within the Pacific Coast states but they were concentrated in or near three of the large cities, Seattle, Portland and Los Angeles, all in Military Area No. 1.[3]

There is support for the view that social, economic and political conditions which have prevailed since the close of the last century, when the Japanese began to come to this country in substantial numbers, have intensified their solidarity and have in large measure prevented their assimilation as an integral part of the white population.[4] In addition, large numbers of children of Japanese par-

---

[2] See "Attack upon Pearl Harbor by Japanese Armed Forces," Report of the Commission Appointed by the President, dated January 23, 1942, S. Doc. No. 159, 77th Cong., 2d Sess., pp. 12–13.

[3] Sixteenth Census of the United States, for 1940, Population, Second Series, Characteristics of the Population (Dept. of Commerce): California, pp. 10, 61; Oregon, pp. 10, 50; Washington, pp. 10, 52. See also H. R. Rep. No. 2124, 77th Cong., 2d Sess., pp. 91–100.

[4] Federal legislation has denied to the Japanese citizenship by naturalization (R. S. § 2169; 8 U. S. C. § 703; see *Ozawa* v. *United States*, 260 U. S. 178), and the Immigration Act of 1924 excluded them from

entage are sent to Japanese language schools outside the regular hours of public schools in the locality. Some of these schools are generally believed to be sources of Japanese nationalistic propaganda, cultivating allegiance to Japan.[5] Considerable numbers, estimated to be approximately 10,000, of American-born children of Japanese parentage have been sent to Japan for all or a part of their education.[6]

Congress and the Executive, including the military commander, could have attributed special significance, in its bearing on the loyalties of persons of Japanese descent, to the maintenance by Japan of its system of dual citizenship. Children born in the United States of Japanese alien parents, and especially those children born before December 1, 1924, are under many circumstances deemed, by Japanese law, to be citizens of Japan.[7] No

admission into the United States. 43 Stat. 161, 8 U. S. C. § 213. State legislation has denied to alien Japanese the privilege of owning land. 1 California General Laws (Deering, 1931), Act 261; 5 Oregon Comp. Laws Ann. (1940), § 61–102; 11 Washington Rev. Stat. Ann. (Remington, 1933), §§ 10581–10582. It has also sought to prohibit intermarriage of persons of Japanese race with Caucasians. Montana Rev. Codes (1935), § 5702. Persons of Japanese descent have often been unable to secure professional or skilled employment except in association with others of that descent, and sufficient employment opportunities of this character have not been available. Mears, Resident Orientals on the American Pacific Coast (1927), pp. 188, 198–209, 402–03; H. R. Rep. No. 2124, 77th Cong., 2d Sess., pp. 101–38.

[5] Hearings before the Select Committee Investigating National Defense Migration, House of Representatives, 77th Cong., 2d Sess., pp. 11702, 11393–94, 11348.

[6] H. R. Rep. No. 1911, 77th Cong., 2d Sess., p. 16.

[7] Nationality Law of Japan, Article 1 and Article 20, § 3, and Regulations (Ordinance No. 26) of November 17, 1924,—all printed in Flournoy and Hudson, Nationality Laws (1929), pp. 382, 384–87. See also Foreign Relations of the United States, 1924, vol. 2, pp. 411–13.

official census of those whom Japan regards as having thus retained Japanese citizenship is available, but there is ground for the belief that the number is large.[8]

The large number of resident alien Japanese, approximately one-third of all Japanese inhabitants of the country, are of mature years and occupy positions of influence in Japanese communities. The association of influential Japanese residents with Japanese Consulates has been deemed a ready means for the dissemination of propaganda and for the maintenance of the influence of the Japanese Government with the Japanese population in this country.[9]

As a result of all these conditions affecting the life of the Japanese, both aliens and citizens, in the Pacific Coast area, there has been relatively little social intercourse between them and the white population. The restrictions, both practical and legal, affecting the privileges and opportunities afforded to persons of Japanese extraction residing in the United States, have been sources of irritation and may well have tended to increase their isolation, and in many instances their attachments to Japan and its institutions.

Viewing these data in all their aspects, Congress and the Executive could reasonably have concluded that these conditions have encouraged the continued attachment of members of this group to Japan and Japanese institutions.

---

[8] Statistics released in 1927 by the Consul General of Japan at San Francisco asserted that over 51,000 of the approximately 63,000 American-born persons of Japanese parentage then in the western part of the United States held Japanese citizenship. Mears, Resident Orientals on the American Pacific Coast, pp. 107–08, 429. A census conducted under the auspices of the Japanese government in 1930 asserted that approximately 47% of American-born persons of Japanese parentage in California held dual citizenship. Strong, The Second-Generation Japanese Problem (1934), p. 142.

[9] H. R. Rep. No. 1911, 77th Cong., 2d Sess., p. 17.

These are only some of the many considerations which those charged with the responsibility for the national defense could take into account in determining the nature and extent of the danger of espionage and sabotage, in the event of invasion or air raid attack. The extent of that danger could be definitely known only after the event and after it was too late to meet it. Whatever views we may entertain regarding the loyalty to this country of the citizens of Japanese ancestry, we cannot reject as unfounded the judgment of the military authorities and of Congress that there were disloyal members of that population, whose number and strength could not be precisely and quickly ascertained. We cannot say that the war-making branches of the Government did not have ground for believing that in a critical hour such persons could not readily be isolated and separately dealt with, and constituted a menace to the national defense and safety, which demanded that prompt and adequate measures be taken to guard against it.

Appellant does not deny that, given the danger, a curfew was an appropriate measure against sabotage. It is an obvious protection against the perpetration of sabotage most readily committed during the hours of darkness. If it was an appropriate exercise of the war power its validity is not impaired because it has restricted the citizen's liberty. Like every military control of the population of a dangerous zone in war time, it necessarily involves some infringement of individual liberty, just as does the police establishment of fire lines during a fire, or the confinement of people to their houses during an air raid alarm—neither of which could be thought to be an infringement of constitutional right. Like them, the validity of the restraints of the curfew order depends on all the conditions which obtain at the time the curfew is imposed and which support the order imposing it.

But appellant insists that the exercise of the power is inappropriate and unconstitutional because it discriminates against citizens of Japanese ancestry, in violation of the Fifth Amendment. The Fifth Amendment contains no equal protection clause and it restrains only such discriminatory legislation by Congress as amounts to a denial of due process. *Detroit Bank* v. *United States,* 317 U. S. 329, 337–38, and cases cited. Congress may hit at a particular danger where it is seen, without providing for others which are not so evident or so urgent. *Keokee Coke Co.* v. *Taylor,* 234 U. S. 224, 227.

Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. For that reason, legislative classification or discrimination based on race alone has often been held to be a denial of equal protection. *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Yu Cong Eng* v. *Trinidad,* 271 U. S. 500; *Hill* v. *Texas,* 316 U. S. 400. We may assume that these considerations would be controlling here were it not for the fact that the danger of espionage and sabotage, in time of war and of threatened invasion, calls upon the military authorities to scrutinize every relevant fact bearing on the loyalty of populations in the danger areas. Because racial discriminations are in most circumstances irrelevant and therefore prohibited, it by no means follows that, in dealing with the perils of war, Congress and the Executive are wholly precluded from taking into account those facts and circumstances which are relevant to measures for our national defense and for the successful prosecution of the war, and which may in fact place citizens of one ancestry in a different category from others. "We must never forget, that it is *a constitution* we are expounding," "a constitution intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human

affairs." *McCulloch* v. *Maryland*, 4 Wheat. 316, 407, 415. The adoption by Government, in the crisis of war and of threatened invasion, of measures for the public safety, based upon the recognition of facts and circumstances which indicate that a group of one national extraction may menace that safety more than others, is not wholly beyond the limits of the Constitution and is not to be condemned merely because in other and in most circumstances racial distinctions are irrelevant. Cf. *Clarke* v. *Deckebach*, 274 U. S. 392, and cases cited.

Here the aim of Congress and the Executive was the protection against sabotage of war materials and utilities in areas thought to be in danger of Japanase invasion and air attack. We have stated in detail facts and circumstances with respect to the American citizens of Japanese ancestry residing on the Pacific Coast which support the judgment of the war-waging branches of the Government that some restrictive measure was urgent. We cannot say that these facts and circumstances, considered in the particular war setting, could afford no ground for differentiating citizens of Japanese ancestry from other groups in the United States. The fact alone that attack on our shores was threatened by Japan rather than another enemy power set these citizens apart from others who have no particular associations with Japan.

Our investigation here does not go beyond the inquiry whether, in the light of all the relevant circumstances preceding and attending their promulgation, the challenged orders and statute afforded a reasonable basis for the action taken in imposing the curfew. We cannot close our eyes to the fact, demonstrated by experience, that in time of war residents having ethnic affiliations with an invading enemy may be a greater source of danger than those of a different ancestry. Nor can we deny that Congress, and the military authorities acting with its

authorization, have constitutional power to appraise the danger in the light of facts of public notoriety. We need not now attempt to define the ultimate boundaries of the war power. We decide only the issue as we have defined it—we decide only that the curfew order as applied, and at the time it was applied, was within the boundaries of the war power. In this case it is enough that circumstances within the knowledge of those charged with the responsibility for maintaining the national defense afforded a rational basis for the decision which they made. Whether we would have made it is irrelevant.

What we have said also disposes of the contention that the curfew order involved an unlawful delegation by Congress of its legislative power. The mandate of the Constitution that all legislative power granted "shall be vested in Congress" has never been thought, even in the administration of civil affairs, to preclude Congress from resorting to the aid of executive or administrative officers in determining by findings whether the facts are such as to call for the application of previously adopted legislative standards or definitions of Congressional policy.

The purpose of Executive Order No. 9066, and the standard which the President approved for the orders authorized to be promulgated by the military commander—as disclosed by the preamble of the Executive Order—was the protection of our war resources against espionage and sabotage. Public Proclamations Nos. 1 and 2 by General DeWitt, contain findings that the military areas created and the measures to be prescribed for them were required to establish safeguards against espionage and sabotage. Both the Executive Order and the Proclamations were before Congress when the Act of March 21, 1942, was under consideration. To the extent that the Executive Order authorized orders to be promulgated by the military commander to accomplish the declared purpose of the

Order, and to the extent that the findings in the Procla-
mations establish that such was their purpose, both have
been approved by Congress.

It is true that the Act does not in terms establish a
particular standard to which orders of the military com-
mander are to conform, or require findings to be made as
a prerequisite to any order. But the Executive Order,
the Proclamations and the statute are not to be read in
isolation from each other. They were parts of a single
program and must be judged as such. The Act of March
21, 1942, was an adoption by Congress of the Executive
Order and of the Proclamations. The Proclamations
themselves followed a standard authorized by the Execu-
tive Order—the necessity of protecting military resources
in the designated areas against espionage and sabotage.
And by the Act, Congress gave its approval to that stand-
ard. We have no need to consider now the validity of
action if taken by the military commander without con-
forming to this standard approved by Congress, or the
validity of orders made without the support of findings
showing that they do so conform. Here the findings of
danger from espionage and sabotage, and of the necessity
of the curfew order to protect against them, have been
duly made. General DeWitt's Public Proclamation No.
3, which established the curfew, merely prescribed regu-
lations of the type and in the manner which Public Proc-
lamations Nos. 1 and 2 had announced would be prescribed
at a future date, and was thus founded on the findings of
Proclamations Nos. 1 and 2.

The military commander's appraisal of facts in the light
of the authorized standard, and the inferences which he
drew from those facts, involved the exercise of his in-
formed judgment. But as we have seen, those facts, and
the inferences which could be rationally drawn from them,
support the judgment of the military commander, that

the danger of espionage and sabotage to our military resources was imminent, and that the curfew order was an appropriate measure to meet it.

Where, as in the present case, the standard set up for the guidance of the military commander, and the action taken and the reasons for it, are in fact recorded in the military orders, so that Congress, the courts and the public are assured that the orders, in the judgment of the commander, conform to the standards approved by the President and Congress, there is no failure in the performance of the legislative function. *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126, 142–46, and cases cited. The essentials of that function are the determination by Congress of the legislative policy and its approval of a rule of conduct to carry that policy into execution. The very necessities which attend the conduct of military operations in time of war in this instance as in many others preclude Congress from holding committee meetings to determine whether there is danger, before it enacts legislation to combat the danger.

The Constitution as a continuously operating charter of government does not demand the impossible or the impractical. The essentials of the legislative function are preserved when Congress authorizes a statutory command to become operative, upon ascertainment of a basic conclusion of fact by a designated representative of the Government. Cf. *The Aurora,* 7 Cranch 382; *United States* v. *Chemical Foundation,* 272 U. S. 1, 12. The present statute, which authorized curfew orders to be made pursuant to Executive Order No. 9066 for the protection of war resources from espionage and sabotage, satisfies those requirements. Under the Executive Order the basic facts, determined by the military commander in the light of knowledge then available, were whether that danger existed and whether a curfew order was an appropriate means of minimizing the danger. Since his findings to

that effect were, as we have said, not without adequate support, the legislative function was performed and the sanction of the statute attached to violations of the curfew order. It is unnecessary to consider whether or to what extent such findings would support orders differing from the curfew order.

The conviction under the second count is without constitutional infirmity. Hence we have no occasion to review the conviction on the first count since, as already stated, the sentences on the two counts are to run concurrently and conviction on the second is sufficient to sustain the sentence. For this reason also it is unnecessary to consider the Government's argument that compliance with the order to report at the Civilian Control Station did not necessarily entail confinement in a relocation center.

*Affirmed.*

Mr. Justice Douglas, concurring:

While I concur in the result and agree substantially with the opinion of the Court, I wish to add a few words to indicate what for me is the narrow ground of decision.

After the disastrous bombing of Pearl Harbor the military had a grave problem on its hands. The threat of Japanese invasion of the west coast was not fanciful but real. The presence of many thousands of aliens and citizens of Japanese ancestry in or near to the key points along that coast line aroused special concern in those charged with the defense of the country. They believed that not only among aliens but also among citizens of Japanese ancestry there were those who would give aid and comfort to the Japanese invader and act as a fifth column before and during an invasion.[1] If the military

---

[1] Judge Fee stated in *United States* v. *Yasui*, 48 F. Supp. 40, 44–45, the companion case to the present one, "The areas and zones outlined in the proclamations became a theatre of operations, subjected in

were right in their belief that among citizens of Japanese ancestry there was an actual or incipient fifth column, we were indeed faced with the imminent threat of a dire emergency. We must credit the military with as much good faith in that belief as we would any other public official acting pursuant to his duties. We cannot possibly know all the facts which lay behind that decision. Some of them may have been as intangible and as imponderable as the factors which influence personal or business decisions in daily life. The point is that we cannot sit in judgment on the military requirements of that hour. Where the orders under the present Act have some relation to "protection against espionage and against sabotage," our task is at an end.

Much of the argument assumes that as a matter of policy it might have been wiser for the military to have dealt with these people on an individual basis and through the process of investigation and hearings separated those who were loyal from those who were not. But the wisdom or expediency of the decision which was made is not for us to review. Nor are we warranted where national survival is at stake in insisting that those orders should not have been applied to anyone without some evidence of his disloyalty. The orders as applied to the petitioner are not to be tested by the substantial evidence rule. Peacetime procedures do not necessarily fit wartime needs. It is said that if citizens of Japanese ancestry were generally disloyal, treatment on a group basis might be justified. But there is no difference in power when the num-

localities to attack and all threatened during this period with a full scale invasion. The danger at the time this prosecution was instituted was imminent and immediate. The difficulty of controlling members of an alien race, many of whom, although citizens, were disloyal with opportunities of sabotage and espionage, with invasion imminent, presented a problem requiring for solution ability and devotion of the highest order."

ber of those who are finally shown to be disloyal or suspect is reduced to a small per cent. The sorting process might indeed be as time-consuming whether those who were disloyal or suspect constituted nine or ninety-nine per cent. And the pinch of the order on the loyal citizens would be as great in any case. But where the peril is great and the time is short, temporary treatment on a group basis may be the only practicable expedient whatever the ultimate percentage of those who are detained for cause. Nor should the military be required to wait until espionage or sabotage becomes effective before it moves.

It is true that we might now say that there was ample time to handle the problem on the individual rather than the group basis. But military decisions must be made without the benefit of hindsight. The orders must be judged as of the date when the decision to issue them was made. To say that the military in such cases should take the time to weed out the loyal from the others would be to assume that the nation could afford to have them take the time to do it. But as the opinion of the Court makes clear, speed and dispatch may be of the essence. Certainly we cannot say that those charged with the defense of the nation should have procrastinated until investigations and hearings were completed. At that time further delay might indeed have seemed to be wholly incompatible with military responsibilities.

Since we cannot override the military judgment which lay behind these orders, it seems to me necessary to concede that the army had the power to deal temporarily with these people on a group basis. Petitioner therefore was not justified in disobeying the orders.

But I think it important to emphasize that we are dealing here with a problem of loyalty not assimilation. Loyalty is a matter of mind and of heart not of race. That indeed is the history of America. Moreover, guilt is per-

sonal under our constitutional system. Detention for reasonable cause is one thing. Detention on account of ancestry is another.

In this case the petitioner tendered by a plea in abatement the question of his loyalty to the United States. I think that plea was properly stricken; military measures of defense might be paralyzed if it were necessary to try out that issue preliminarily. But a denial of that opportunity in this case does not necessarily mean that petitioner could not have had a hearing on that issue in some appropriate proceeding. Obedience to the military orders is one thing. Whether an individual member of a group must be afforded at some stage an opportunity to show that, being loyal, he should be reclassified is a wholly different question.

There are other instances in the law where one must obey an order before he can attack as erroneous the classification in which he has been placed. Thus it is commonly held that one who is a conscientious objector has no privilege to defy the Selective Service Act and to refuse or fail to be inducted. He must submit to the law. But that line of authority holds that after induction he may obtain through *habeas corpus* a hearing on the legality of his classification by the draft board.[2] Whether in the present situation that remedy would be available is one

_____

[2] See *United States* v. *Powell,* 38 F. Supp. 183; *Application of Greenberg,* 39 F. Supp. 13; *United States* v. *Baird,* 39 F. Supp. 392; *Micheli* v. *Paullin,* 45 F. Supp. 687; *United States* v. *Embrey,* 46 F. Supp. 916; *In re Rogers,* 47 F. Supp. 265; *Ex parte Stewart,* 47 F. Supp. 410; *United States* v. *Smith,* 48 F. Supp. 842; *Ex parte Robert,* 49 F. Supp. 131; *United States* v. *Grieme,* 128 F. 2d 811; *Fletcher* v. *United States,* 129 F. 2d 262; *Drumheller* v. *Berks County Local Board No. 1,* 130 F. 2d 610, 612. For cases arising under the Selective Draft Act of 1917, see *United States* v. *Kinkead,* 250 F. 692; *Ex parte McDonald,* 253 F. 99; *Ex parte Cohen,* 254 F. 711; *Arbitman* v. *Woodside,* 258 F. 441; *Ex parte Thieret,* 268 F. 472, 476. And see 10 Geo. Wash. L. Rev. 827.

of the large and important issues reserved by the present decision. It has been suggested that an administrative procedure has been established to relieve against unwarranted applications of these orders. Whether in that event the administrative remedy would be the only one available or would have to be first exhausted is also reserved. The scope of any relief which might be afforded—whether the liberties of an applicant could be restored only outside the areas in question—is likewise a distinct issue. But if it were plain that no machinery was available whereby the individual could demonstrate his loyalty as a citizen in order to be reclassified, questions of a more serious character would be presented. The United States, however, takes no such position. We need go no further here than to deny the individual the right to defy the law. It is sufficient to say that he cannot test in that way the validity of the orders as applied to him.

MR. JUSTICE MURPHY, concurring:

It is not to be doubted that the action taken by the military commander in pursuance of the authority conferred upon him was taken in complete good faith and in the firm conviction that it was required by considerations of public safety and military security. Neither is it doubted that the Congress and the Executive working together may generally employ such measures as are necessary and appropriate to provide for the common defense and to wage war "with all the force necessary to make it effective." *United States* v. *Macintosh,* 283 U. S. 605, 622. This includes authority to exercise measures of control over persons and property which would not in all cases be permissible in normal times.[1]

---

[1] *Schenck* v. *United States,* 249 U. S. 47; *Debs* v. *United States,* 249 U. S. 211; *United States* v. *Bethlehem Steel Corp.,* 315 U. S. 289, 305; *Northern Pacific Ry. Co.* v. *North Dakota,* 250 U. S. 135; *Da-*

It does not follow, however, that the broad guaranties of the Bill of Rights and other provisions of the Constitution protecting essential liberties are suspended by the mere existence of a state of war. It has been frequently stated and recognized by this Court that the war power, like the other great substantive powers of government, is subject to the limitations of the Constitution. See *Ex parte Milligan*, 4 Wall. 2; *Hamilton* v. *Kentucky Distilleries Co.*, 251 U. S. 146, 156; *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 426. We give great deference to the judgment of the Congress and of the military authorities as to what is necessary in the effective prosecution of the war, but we can never forget that there are constitutional boundaries which it is our duty to uphold. It would not be supposed, for instance, that public elections could be suspended or that the prerogatives of the courts could be set aside, or that persons not charged with offenses against the law of war (see *Ex parte Quirin*, 317 U. S. 1) could be deprived of due process of law and the benefits of trial by jury, in the absence of a valid declaration of martial law. Cf. *Ex parte Milligan, supra.*

Distinctions based on color and ancestry are utterly inconsistent with our traditions and ideals. They are at variance with the principles for which we are now waging war. We cannot close our eyes to the fact that for centuries the Old World has been torn by racial and religious conflicts and has suffered the worst kind of anguish because of inequality of treatment for different groups. There was one law for one and a different law for another. Nothing is written more firmly into our law than the compact of the Plymouth voyagers to have just

---

*kota Central Tel. Co.* v. *South Dakota*, 250 U. S. 163; *Highland* v. *Russell Car Co.*, 279 U. S. 253; *Selective Draft Law Cases*, 245 U. S. 366.

and equal laws. To say that any group cannot be assimilated is to admit that the great American experiment has failed, that our way of life has failed when confronted with the normal attachment of certain groups to the lands of their forefathers. As a nation we embrace many groups, some of them among the oldest settlements in our midst, which have isolated themselves for religious and cultural reasons.

Today is the first time, so far as I am aware, that we have sustained a substantial restriction of the personal liberty of citizens of the United States based upon the accident of race or ancestry. Under the curfew order here challenged no less than 70,000 American citizens have been placed under a special ban and deprived of their liberty because of their particular racial inheritance. In this sense it bears a melancholy resemblance to the treatment accorded to members of the Jewish race in Germany and in other parts of Europe. The result is the creation in this country of two classes of citizens for the purposes of a critical and perilous hour—to sanction discrimination between groups of United States citizens on the basis of ancestry. In my opinion this goes to the very brink of constitutional power.

Except under conditions of great emergency a regulation of this kind applicable solely to citizens of a particular racial extraction would not be regarded as in accord with the requirement of due process of law contained in the Fifth Amendment. We have consistently held that attempts to apply regulatory action to particular groups solely on the basis of racial distinction or classification is not in accordance with due process of law as prescribed by the Fifth and Fourteenth Amendments. Cf. *Yick Wo v. Hopkins*, 118 U. S. 356, 369; *Yu Cong Eng v. Trinidad*, 271 U. S. 500, 524–28. See also *Boyd v. Frankfort*, 117 Ky. 199, 77 S. W. 669; *Opinion of the Justices*, 207 Mass.

601, 94 N. E. 558. It is true that the Fifth Amendment, unlike the Fourteenth, contains no guarantee of equal protection of the laws. Cf. *Currin* v. *Wallace*, 306 U. S. 1, 14. It is also true that even the guaranty of equal protection of the laws allows a measure of reasonable classification. It by no means follows, however, that there may not be discrimination of such an injurious character in the application of laws as to amount to a denial of due process of law as that term is used in the Fifth Amendment.[2] I think that point is dangerously approached when we have one law for the majority of our citizens and another for those of a particular racial heritage.

In view, however, of the critical military situation which prevailed on the Pacific Coast area in the spring of 1942, and the urgent necessity of taking prompt and effective action to secure defense installations and military operations against the risk of sabotage and espionage, the military authorities should not be required to conform to standards of regulatory action appropriate to normal times. Because of the damage wrought by the Japanese at Pearl Harbor and the availability of new weapons and new techniques with greater capacity for speed and deception in offensive operations, the immediate possibility of an attempt at invasion somewhere along the Pacific Coast had to be reckoned with. However desirable such a procedure might have been, the military authorities could have reasonably concluded at

---

[2] For instance, if persons of an accused's race were systematically excluded from a jury in a federal court, any conviction undoubtedly would be considered a violation of the requirement of due process of law, even though the ground commonly stated for setting aside convictions so obtained in state courts is denial of equal protection of the laws. Cf. *Glasser* v. *United States*, 315 U. S. 60, with *Smith* v. *Texas*, 311 U. S. 128.

the time that determinations as to the loyalty and dependability of individual members of the large and widely scattered group of persons of Japanese extraction on the West Coast could not be made without delay that might have had tragic consequences. Modern war does not always wait for the observance of procedural requirements that are considered essential and appropriate under normal conditions. Accordingly I think that the military arm, confronted with the peril of imminent enemy attack and acting under the authority conferred by the Congress, made an allowable judgment at the time the curfew restriction was imposed. Whether such a restriction is valid today is another matter.

In voting for affirmance of the judgment I do not wish to be understood as intimating that the military authorities in time of war are subject to no restraints whatsoever, or that they are free to impose any restrictions they may choose on the rights and liberties of individual citizens or groups of citizens in those places which may be designated as "military areas." While this Court sits, it has the inescapable duty of seeing that the mandates of the Constitution are obeyed. That duty exists in time of war as well as in time of peace, and in its performance we must not forget that few indeed have been the invasions upon essential liberties which have not been accompanied by pleas of urgent necessity advanced in good faith by responsible men. Cf. Mr. Justice Brandeis concurring in *Whitney* v. *California,* 274 U. S. 357, 372.

Nor do I mean to intimate that citizens of a particular racial group whose freedom may be curtailed within an area threatened with attack should be generally prevented from leaving the area and going at large in other areas that are not in danger of attack and where special precautions are not needed. Their status as citizens, though subject to requirements of national security and

military necessity, should at all times be accorded the fullest consideration and respect. When the danger is past, the restrictions imposed on them should be promptly removed and their freedom of action fully restored.

Mr. Justice Rutledge, concurring:

I concur in the Court's opinion, except for the suggestion, if that is intended (as to which I make no assertion), that the courts have no power to review any action a military officer may "in his discretion" find it necessary to take with respect to civilian citizens in military areas or zones, once it is found that an emergency has created the conditions requiring or justifying the creation of the area or zone and the institution of some degree of military control short of suspending habeas corpus. Given the generating conditions for exercise of military authority and recognizing the wide latitude for particular applications that ordinarily creates, I do not think it is necessary in this case to decide that there is no action a person in the position of General DeWitt here may take, and which he may regard as necessary to the region's or the country's safety, which will call judicial power into play. The officer of course must have wide discretion and room for its operation. But it does not follow there may not be bounds beyond which he cannot go and, if he oversteps them, that the courts may not have power to protect the civilian citizen. But in this case that question need not be faced and I merely add my reservation without indication of opinion concerning it.