**UNITED STATES v. FUJII et al.**

Nos. 4928, 4931–4992.

District Court, D. Wyoming.
June 26, 1944.

Carl L. Sackett, U. S. Atty., and John C. Pickett, Asst. U. S. Atty., both of Cheyenne, Wyo., for plaintiff.

Samuel D. Menin, of Denver, Colo., and Clyde M. Watts, of Cheyenne, Wyo., for defendants.

KENNEDY, District Judge.

The above causes are brought by indictments for violation of the Selective Training and Service Act of 1940, 50 U.S.C.A. Appendix, § 311. The defendants were severally arrested and arraigned before the Court upon such indictments to which all individually pleaded not guilty. The defendants were at said arraignment and at all other times in the trial of said cause represented by counsel selected by themselves. It was stipulated that the cases should be consolidated for the purpose of trial and that a jury would be waived and the cases tried to the Court without intervention of a jury, to which stipulation each individual defendant in open Court assented. The cases were thereupon set for trial on June 12, at which time the trials were commenced, and were concluded on June 19, 1944.

The proofs of the Government in support of the charges laid in the indictments show that the defendants were registrants at various local Selective Service Boards in the State of California and other western States; that they were all male citizens of the United States and within the draft age; that they were variously classified by their respective Boards in 1–A or sometimes subsequently in 4–C; that eventually they were all re-classified in 1–A and thereafter ordered to report for pre-induction physical examination. Inasmuch as defendants had

been placed in a Relocation Center at Heart Mountain, Wyoming, the personal files and orders were sent to the Selective Service Board at Powell, Wyoming, for the purpose of carrying the orders of the local boards into effect as permitted by the Act and Regulations thereunder. Under an order of the Powell Board they were all directed to appear at specified times for pre-induction physical examination which order the defendants failed to obey. In several of the cases the defendants, after having been classified in 1-A, were directed to appear for induction at various places in the vicinity of their former places of residence but in all instances the time specified by the order for appearance for pre-induction physical examination was prior to the time that the orders of the respective Boards required them to appear for induction. Traveling facilities were afforded by the Government to transport said defendants from the relocation center to the location of the Board specified under the terms of the pre-induction order. Upon their failure to report for pre-induction physical examination, their names were individually reported to the United States Attorney for the District of Wyoming and their cases were presented to a grand jury resulting in the indictments upon which this prosecution is based. The defendants, upon their arrest, as is the usual custom, were fingerprinted by the United States Marshal and statements taken in connection with said fingerprinting process to which each defendant signed his name without objection. Each of the defendants was, in advance of the trial, interviewed by special agents of the Federal Bureau of Investigation and all were given the customary warning that they were being interviewed by an agent of the government, whose identity was established; that they were not required to make any statement and if they did make a statement it might be used in Court against them; that no promises or threats were made by said agents; that they were all entitled to counsel if they demanded it; and that each defendant, with one exception, freely and voluntarily made a statement to such official, some of which were taken down in writing, read over and signed by the defendant, and others made oral statements, proof of which was adduced upon the stand. There appeared to be no evidence of mistreatment either mental or physical and no coercion used in procuring such statements. There is no testimony in the record to the contrary. It appears from these statements, with the one exception heretofore mentioned, that the defendants each received his order to appear for pre-induction physical examination and that he purposely and wilfully refused to obey said order. In each instance the reason given for failure to obey said order was in the nature of a complaint that he had not been accorded his rights as an American citizen in being removed by the Military establishment from his place of former residence into a Relocation Center, that he had been previously classified as 4-C which is a class under the regulations used for enemy aliens, and that each defendant had determined on his own responsibility not to appear in response to the order for pre-induction physical examination until his rights of citizenship had been clarified. The isolated instance was in Case No. 4952—Kimura, who refused to give an interview to an agent of the Government. However, in his case it was proved that when he was arrested he had a copy of the order for him to appear upon his person. It appears from the testimony that the defendants, with many others of Japanese ancestry, were removed by the Military establishment of the Government to various relocation centers and away from the danger zones presumed to be existing along the west coast where the fear of invasion by the Japanese Government with which the United States was at war centered, and that Heart Mountain in Wyoming was one of these Relocation Centers. Here the defendants and others of their class were housed and fed in a satisfactory manner and were permitted to live in families and enjoy the ordinary family relations. A portion of the Center was surrounded by barbed wire fences and various entrances and exits were provided at which guards were stationed. No one was permitted to enter or leave the Center, whether of Japanese ancestry or otherwise, without receiving a permit from the Director. These permits were issued indiscriminately to the occupants of such Center where the reason given was a legitimate one. They were given permits upon application to seek employment outside, either permanent or temporary, and were permitted upon request to go to neighboring towns if they desired. None of the defendants in this case appears to have been refused permission to seek employment elsewhere and the permits seem to have been used as a method

of keeping track of the occupants of the Center after they had been permitted to leave. Only one instance (not a defendant here) was given of an occupant of the Center of Japanese descent leaving without a permit and he was subsequently sent to Tule Lake, California. No evidence was offered by the defendants except by recalling the Assistant Director of the Relocation Center at Heart Mountain for the purpose of amplifying the method of conducting the Center in connection with the privileges extended to the occupants.

■ For the defense it is mildly suggested that there was no identification of each individual defendant on trial and because of the fact that the sixty-three defendants were all before the Court at the same time for trial and bearing some resemblance on account of their Japanese ancestry they could not be picked out by any Government official as being a defendant responding to the name under which he was indicted. It is true that there were several identifications of individual defendants by facial appearance but not of all. However, the answer to this suggestion is that the defendants were identified by fingerprints to which they willingly attached their signatures at or about the time of arrest. The defendants likewise identified themselves to the Government agents by responding to their names when called for the purpose of interview. They likewise identified themselves by responding to the call of the Court of their names upon the docket both at the time of arraignment and at the commencement of the trial. Finally, they now assert through the mouth of their counsel that their reasons given for failure to obey the order for pre-induction physical examination was a valid and legal excuse. Counsel argue that because of the fact that some of the defendants were ordered for induction before their respective Boards at a time while they were occupants of the Relocation Center and subsequently placed under arrest and therefore could not physically obey the order for induction that they were thereby absolved from obeying the order for pre-induction physical examination.

■ It appears that at one time persons eligible under the draft were called for induction and thereafter examined as to physical ability. Later regulations were established by which persons under proper classification would be called for pre-induction physical examination thereby saving time and effort in the matter of induction as those who did not pass a satisfactory physical examination would not be ordered to appear for induction and could be re-classified accordingly. This regulation and its interpretation led to some discussion as to its meaning, but if it is material at all I think the true import of it is for the purpose above stated and should be regarded in no sense as affecting the rights of the defendants here. The subsequent order for induction which they perhaps may not have been able to obey, in no way discharged them from the liability to obey a previous order which it was possible for them to obey. That a subsequent order of the Selective Service Board or any relaxation of the same does not vitiate a previous disobeyed order is definitely ruled in Marshall v. United States, 5 Cir., 140 F.2d 261; and United States v. Roth, D.C., 53 F.Supp. 465.

■ The defendants assert that inasmuch as they are American citizens by birth that they have been discriminated against by various acts of the Government, in classifying them in 4–C which includes enemy aliens, and removing them from their places of residence to Relocation Centers, their loyalty to the United States Government has thereby been questioned without reason and that they should not be reclassified for service in the war at least until such time as "their status of citizenship has been clarified"—to use the expression contained in letters to their various Draft Boards and to the Government Officials. The Government regulations permit the classification of citizens of Japanese ancestry into 4 –C which includes enemy aliens, at least this is the contemplation of the regulation, until their status as to being loyal citizens has been ascertained by investigation. If the Selective Service Act and the regulations thereunder permit, under the war emergency, the treatment of this class of citizens in regard to restrictions upon their personal habits in their respective communities and likewise removal to Relocation Centers, it would seem that the matter of classification for the time being in 4–C would be of relatively less importance than such other regulations mentioned. That the regulations promulgated by Congress and the President in establishing as a military necessity the Western Defense Command of Military Areas and Zones is legal has been definitely determined in Kiyoshi Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774. There the matter litigated

was the constitutionality of the establishment of a "curfew law" in which all Japanese-American citizens were required to report and be restricted to their places of residence during certain hours of the day. The Supreme Court in its decision of the matter bases its conclusion upon the exigencies of war existing between the United States and the Japanese Nation, calling attention to the "sneak" attack upon Pearl Harbor, with an observation that the Japanese Diplomatic Representatives were at the same time conducting negotiations with the State Department for the purpose of settling differences between the two countries. Attention is also given in the opinion to the fact that the Japanese Government recognizes a dual citizenship and maintains that children of Japanese Nationals are citizens of the Japanese Empire whatever may be their place of birth even among persons of Japanese ancestry born in this country and therefore are citizens of Japan; that there might be logic in the conclusions that in a case of war these would hold their attachment to Japan; and that in a critical hour these could not be effectively segregated so as to relieve a menace to the National defense and safety. That Court concludes that in time of war the Nation must use measures to protect its National defense and that the Government may hit at a particular danger where it is seen. While this case does not pass upon the legality of the removal and relocation of persons under the class here before the Court, the opinion calls attention to the establishment by Executive Order of the War Relocation Authority and the right thereby afforded to effectuate a program for removal, relocation, maintenance and supervision of the persons under consideration. Our attention has not been called to any case in which the Courts have construed the constitutionality of the removal and relocation of citizens of Japanese extraction, yet it would seem that the same logic which led to the conclusion that the curfew law did not violate their constitutional rights would justify a like conclusion in regard to removal and relocation.

█ █ It is contended that there is no evidence of criminal intent upon the part of the defendants. The proof discloses, however, that they wilfully and intentionally neglected and refused to obey the order of the Board to report for pre-induction physical examination. This is a sufficient showing of intent to violate the law

unless the reasons given for the failure could be determined sufficient in law to justify their actions. It has been seen that the discrimination exercised by the Government on account of their Japanese ancestry was legitimate, justified and legal as being within the power of Congress and the President in the war emergency. Kiyoshi Hirabayashi v. United States, supra. As to the assertion that they did not desire to report until their citizenship had been clarified, this is without merit as to legal basis. The Courts have repeatedly asserted that the orders of the Boards of Selective Service have the substance of Congressional Acts and must be obeyed. It is evident that what they asserted in the matter of the clarification of their citizenship was in fact accomplished by the effect of the order which they disobeyed. After they had been segregated an investigation was undoubtedly made by the Intelligence Branch of the Military Service and in substantial numbers they were cleared of any suspicion of disloyalty and thereafter classified for military service the same as had been all other eligible classes of American citizens. No fuller exemplification of a clarification of their citizenship could be evinced than that they were recognized through the certificates of acceptability as being such a class of citizens as under regular conditions should be placed in the service of their country. Certainly it cannot be effectively contended that if they had been found disloyal to this country and still bore allegiance to the country of their ancestors they would be thought to be desirable soldiers in the branches of the service fighting for our National existence. When, therefore, they were placed in 1–A and ordered to report for pre-induction physical examination, their pure American citizenship was established beyond question.

█ It is the logic of the decision, in Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, that the Congress has committed to the Selective Service System the manner in which the raising of defense forces shall be brought about and the Judicial branch of the Government is not given an opportunity for intervention before the final acceptance of an individual for national service. We think the principle there expressed applies here and that this Court has no duty to perform by intervening in the process of maintaining the war service until such time at least as a person called has complied with the order of the desig-

nated authority. Due respect by each of our three branches of Federal Government should be paid one to the other in observing strictly the legal functions of each.

Personally this Court feels that the defendants have made a serious mistake in arriving at their conclusions which brought about these criminal prosecutions. If they are truly loyal American citizens they should, at least when they have become recognized as such, embrace the opportunity to discharge the duties of citizens by offering themselves in the cause of our National defense.

From what has been said it is apparent that the finding and verdict of the Court, under the authority delegated to it through the stipulation, must find the defendants and each of them guilty as charged in the indictments. Exceptions are reserved in their behalf.