WILCOX v. DE WITT et al.
Civil Action No. 283.

District Court, S. D. California, S. D.
Sept. 4, 1943.

Lorrin Andrews, of Los Angeles, Cal., for plaintiff.

United States Attorney, for defendant.

HOLLZER, District Judge.

Following a trial upon the merits, this cause was argued and submitted shortly prior to the commencement of the period designated as the court vacation. Nevertheless, because of the gravity of the issues raised, we have devoted the time required to make an exhaustive study of a rather voluminous record and of the various questions presented.

While we would have preferred to file a reasonably comprehensive opinion which would have included a critical and more or less extended discussion of the evidence, the need for an expeditious decision herein convinces us that the delay which the preparation of such an analysis would have entailed is not warranted. Accordingly this memorandum of conclusions must suffice.

The only defendants served, and hence the only parties against whom plaintiff seeks relief, are Lt. Gen. John L. DeWitt, Military Commander of the Western Defense Command, Fourth Army, and Messrs. Nathan and Dorwart, Agents of the Federal Bureau of Investigation of the Department of Justice.

By this suit plaintiff seeks equitable relief, more particularly, a decree enjoining the enforcement of a certain exclusion order issued under date of December 28, 1942, by the Military Commander of the Western Defense Command, Fourth Army, pursuant to Executive Order 9066 promulgated by the President on February 19, 1942, and by vir-

tue of instructions issued by the Secretary of War. This exclusion order prohibited plaintiff from remaining in or entering into certain military areas, comprising the three Pacific Coast states and the state of Arizona, all being in the theatre of military operations within the Western Defense Command, as established in Public Proclamations Nos. 1 and 2 issued by said Military Commander on March 2, and March 16, 1942, respectively, and in addition prohibited him from remaining in or entering into certain other theatres of military operations and comprising all of the states on the Atlantic seaboard, also the coastal regions of all the states bordering on the Gulf of Mexico, and a further area located in Texas adjoining Mexico.

The exclusion order was served on plaintiff about January 22, 1943. At the same time he was served with another document modifying and staying the original exclusion order in certain particulars, and which in effect permitted him upon certain conditions to remain within certain portions of the Military Areas from which he had been excluded, until the conclusion of the trial of the criminal case hereinafter mentioned.

Plaintiff is a native born citizen of the United States and has resided in this state nearly ten years. In 1912 he graduated from the University of Pittsburgh upon completing a course in engineering. About October, 1938, he first associated himself with the work of an organization known as Mankind United. In particular he originally devoted about seven months to its various activities, primarily in Los Angeles County, such as attending meetings participated in by various persons affiliated with that organization, listening to discussions conducted thereat, reading the organization's literature, and in addition during the last three months of that period he worked at one of its bureaus in Los Angeles and learned all of its office procedure, at the same time acquiring an understanding of its program. About May, 1939, he became bureau manager of this organization for San Diego County—later his title was changed to that of County Supervisor—and this position he has continued to hold up to the present time. The work in which he has been engaged in that county is registered under the trade name of Beacon Bureau, of which

plaintiff is sole owner. For about a year and a half his work as such county supervisor involved no contact with the general public, and was confined to supervising circulation of the organization's literature, summarizing its reports, and instructing a small number of individuals to qualify them to become leaders in the organization's work, so that they in turn might instruct about sixty-five to seventy other persons.

The physical assets of the business conducted by plaintiff under the trade name of Beacon Bureau consist of office and automotive equipment, literature and supplies, and have a value of approximately thirty-five hundred dollars. Plaintiff's only source of livelihood is derived from his activities in connection with this work. His net income therefrom during 1942 amounted to forty-seven hundred dollars. The good will value of Beacon Bureau is appraised by him at fifteen thousand dollars. The activities of this organization are confined to the State of California. Plaintiff insists that he has no opportunity for similar employment outside this State. His testimony is to the effect Mankind United is an organization engaged in teaching Divine Truth based upon the Golden Rule, the Sermon on the Mount and the Ten Commandments. He defines his occupation as that of a minister and teacher of Christian Economics and Divine Truth. However, he admits that he is not an ordained minister.

On October 26, 1942, plaintiff was served with a notice which in substance advised him that a Board of Officers had been appointed by the Commanding General, Western Defense Command and Fourth Army, to consider the question whether military necessity required the issuance of an order excluding him from certain Military Areas of the Western Defense Command and similar areas prescribed pursuant to Executive Order 9066, Public Proclamations Nos. 1 and 2 of said headquarters, and special instructions of the Secretary of War. This document further stated that said Board would be convened at a certain place in San Diego (the city of plaintiff's residence) on November 3, 1942, at 3 P. M., that at his option he might appear before the Board for the purpose of being informed of the general

nature and scope of the inquiry and afforded an opportunity to present evidence in his own behalf, also to answer questions or make a statement under oath or affirmation; likewise that material in the hands of the Board would not be made available for his inspection, that all matters pertaining to the inquiry were confidential, and no publicity would be given them by the Board. In addition this notice advised him that he might be accompanied by counsel who would be allowed to act only as his personal advisor, but would not be heard by the Board nor permitted to examine witnesses, that all interrogation of witnesses would be conducted by the Recorder on behalf of himself and of the Board, also that he might refuse to answer any questions asked by the Board, and furthermore that such inquiry was in no sense a criminal proceeding and that he was not charged with the commission of any penal offense. Finally, the notice set forth a copy of Public Law No. 503 enacted by the Congress, approved March 21, 1942, 18 U.S.C.A. § 97a, providing penalties for the violation of an order of exclusion.

Plaintiff appeared at the time and place specified in the aforementioned notice, accompanied by his counsel and two friends associated in the work of Mankind United. He answered such questions as were propounded to him, furnished the Board with copies of various pieces of literature distributed by Mankind United, and was afforded the opportunity of giving evidence in his own behalf. He was not confronted with witnesses against him, nor was he advised as to the information in the Board's possession. His counsel remained with him throughout said hearing, but his friends were not permitted to attend.

At the outset of said hearing the President of said Board read to plaintiff a statement which for the most part consisted of a repetition of the principal contents of the notice theretofore served upon him, and in addition advised him that the Board was concerned with and extended to him the opportunity to testify or to make a statement and to adduce other evidence if he wished in regard to his background, associations and activities in substance as follows: his birthplace, education, occupation, military service, citizenship, marital status and family background, also the circumstances surrounding his membership in Mankind United, and the nature of his duties and activities arising out of his position as bureau manager for that organization.

In addition, upon appearing before said Board, plaintiff submitted a document consisting of his answers to a series of questions comprising a questionnaire which had been delivered to him at the time he was served with the aforementioned notice, and which was designed to elicit biographical data and also information respecting plaintiff's travels, his employment and business experience, his financial operations, his domestic status and history, and his activities with organizations and foreign governments.

On November 3, 1942, following the conclusion of said hearing, the Board consisting of three high ranking Army officers, after considering what is known as the G–2 file of the Western Defense Command and Fourth Army, containing information from the F. B. I. and other official sources, in addition to the evidence submitted at said hearing, prepared its findings and recommended that no Order of Exclusion be entered against plaintiff. Subsequently under date of November 24, 1942, this Board addressed a communication to the Assistant Chief of Staff, Civil Affairs Division, Western Defense Command, to the effect that on November 21, 1942, it had reconsidered the entire file and the evidence adduced at the aforementioned hearing and was still of the opinion that no Exclusion Order should be issued. However, the Board called attention to the fact that the F. B. I. was investigating members of Mankind United for mail fraud and in addition stated that the President of the Board had been advised that the F. B. I. was presenting evidence against all the leaders of Mankind United looking toward indictments for using the mails to defraud.

The evidence further disclosed that, in conformity with the procedure established and customarily followed by the Western Defense Command with respect to individual exclusion cases, the Military In-

telligence Division of said Command had received reports from all Federal Intelligence Agencies based upon investigations conducted by the latter concerning plaintiff. These reports were considered by several different departments and officers of said Command, one of which was the aforementioned Board, also by the United States Attorney for the Southern District of California, and these departments and officials made their findings and recommendations as to whether or not plaintiff should be excluded from the Military Areas mentioned. Ultimately such findings and recommendations and in fact the entire file were submitted to the Commanding General. After studying the same he issued the Exclusion Order complained of.

Meanwhile, on December 17, 1942, plaintiff and many of his associates in the work of Mankind United were indicted on the charge of violating Section 34, Title 50, United States Code Annotated. The trial of said criminal cause not having been concluded, the Commanding General on April 3, 1943, issued a further order, again modifying and staying the original exclusion order. On May 6, 1943, a verdict was returned in said criminal cause finding plaintiff and several of his co-defendants guilty of conspiracy to commit sedition. Four days later sentence was pronounced therein adjudging that plaintiff be committed for imprisonment for the term of five years in an institution of the penitentiary type. An appeal from said judgment and sentence is now pending, and plaintiff is at liberty on bail pending the determination of said appeal.

As the instant case was still awaiting trial, the Commanding General on May 29, 1943, issued still another order, also modifying and staying the original exclusion order, thereby permitting plaintiff upon certain conditions to remain within specified portions of the Military Areas from which he had been ordered excluded, but only until the conclusion of the trial of this case.

At the trial of the within cause Col. Ward Trimble, Assistant Chief of Staff, G-3, Western Defense Command and Fourth Army, whose qualifications as a military expert are not challenged, testified in part that the Japanese attack on Pearl Harbor was accompanied by perfect espionage. He further stated that to protect the area within his command against sabotage and espionage the Commanding General of the Western Defense Command had taken the necessary action to guard the war industries, lines of communication, and the military installations; also that he had taken action to evacuate from said area persons of Japanese ancestry and others who were potentially dangerous to the war effort or in case of attack. No commander of a military theatre, observed this witness, can afford to have potentially dangerous individuals remain in his combat zone. He further pointed out that sabotage and espionage are the most difficult to combat, and that persons of apparent loyalty in other theatres of operation had been found to be actively helping the enemy. The individual exclusion order procedure—the subject of the present litigation—was one of the measures, he affirmed, which General DeWitt had taken to meet the espionage and sabotage threat.

Col. Trimble likewise testified that the danger of external enemy attack, of internal enemy action, of espionage or sabotage, was generally the same at the time of the present trial as it was when the exclusion order procedure was adopted. The threat of hostile attack by sea or air he stated was an ever present threat on the Pacific Coast. The length of the coast line, the great distances in the Pacific, he added, made the situation the same today as it had been since December 7, 1941, one wherein an enemy by air or sea could reasonably be expected to derive profit from a hit and run raid, or even a raid of considerable size. It was his opinion that the Japanese would not let us tighten the ring around their homeland without striking back violently in one or more of our military theatres; although he agreed that the danger of a major Japanese invasion was less likely now than earlier in the war.

This witness further pointed out that judging from Japanese actions up to the present time it can reasonably be expected that they would follow the same pattern, one which calls for sabotage or espionage at the time of the hostile attack. Hit and

run raids, he said, depended mostly on perfect espionage. He also called attention to the attacks which had been made by enemy forces upon the Pacific Coast, namely, the shelling of an oil refinery at Goleta, California in February, 1942, the dropping of incendiary bombs by a Japanese plane which started some fires in the forests of Oregon during the summer of 1942, and the shelling of coast defenses near the mouth of the Columbia River, off the coast of Oregon and Washington, in November, 1942. In his opinion the individual exclusion order procedure, established and followed by the Western Defense Command, removed potentially dangerous persons from the combat zone, and from a military standpoint not only was highly desirable but was vitally necessary.

■ Practically at the close of the trial plaintiff was recalled to the stand, in an attempt to show that he had been denied the opportunity to present evidence in his own behalf at the aforementioned hearing before said Exclusion Board. In support of this effort one of the workers who accompanied him when he appeared before said Exclusion Board, but remained outside the hearing room, also testified in plaintiff's behalf. Some of this testimony was vague, portions of it were indefinite, while other parts were evasive. Searching cross-examination, however, demonstrated that such charge was utterly groundless. It is significant that although in the original complaint plaintiff specified in considerable detail the particulars wherein he asserted that due process had been violated, no such specification of unfairness as he thus tardily made near the conclusion of the trial was set forth. What makes this baseless attack all the more difficult to understand is the fact that, although said Board in its findings referred to plaintiff as a "religious hypocrite using his organization as a means of extracting money from the unwary and credulous under the guise of religion," nevertheless, it recommended that no Order of Exclusion be entered against him. We regard such charge against the Exclusion Board as a deliberate attempt to prejudice the defense in the mind of the Court. Such conduct tends to throw light on the type of individual with whom we are here dealing. In fairness to the counsel who recalled plaintiff to testify on this subject, it should be stated that he was not the latter's attorney of record, but was appearing as amicus curiae, and apparently was told about such claim for the first time near the end of the trial.

■ We turn now to a consideration of the legal principles which in our judgment are decisive of the issues raised in the present litigation. The Supreme Court repeatedly has pointed out, and in its recent decision rendered in Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 1382, 87 L.Ed. 1774, reiterated, that the war power of the national government "is not restricted to the winning of victories in the field and the repulse of enemy forces. It embraces every phase of the national defense, including the protection of war materials and the members of the armed forces from injury and from the dangers which attend the rise, prosecution and progress of war. * * * Since the Constitution commits to the Executive and to Congress the exercise of the war power in all the vicissitudes and conditions of warfare, it has necessarily given them wide scope for the exercise of judgment and discretion in determining the nature and extent of the threatened injury or danger and in the selection of the means for resisting it. * * * Where, as they did here, the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs."

In that same decision the Supreme Court discussed at considerable length the conditions prevailing in the area comprising the Western Defense Command, particularly those portions thereof designated in General DeWitt's Public Proclamations Nos. 1 and 2 as Military Areas and Combat Zones, and analyzed the complex problems and difficulties confronting the military authorities in such area as a result of the war being waged upon us by Japan.

Referring to the Proclamations issued by General DeWitt during March, 1942, the Supreme Court affirmed that the basic facts, determined by him in the light of the knowledge then available, adequately supported his findings to the effect that danger from espionage and sabotage existed, and that a curfew order directed against all enemy aliens and also against all persons of Japanese ancestry, including American citizens, residing within the military areas of the Western Defense Command was an appropriate means of minimizing such danger.

Accordingly the Court there concluded: "We need not now attempt to define the ultimate boundaries of the war power. We decide only the issue as we have defined it—we decide only that the curfew order as applied, and at the time it was applied, was within the boundaries of the war power. In this case it is enough that circumstances within the knowledge of those charged with the responsibility for maintaining the national defense afforded a rational basis for the decision which they made. Whether we would have made it is irrelevant."

While in that case the Supreme Court indicated it was not necessary, in order to decide the same, to pass upon the validity of exclusion orders whereby literally tens of thousands of American citizens were compelled to evacuate their homes and abandon their occupations, nevertheless, it did affirm that, "We cannot reject as unfounded the judgment of the military authorities and of Congress that there were disloyal members of that population (citizens of Japanese ancestry), whose number and strength could not be precisely and quickly ascertained." The Court further declared, "We cannot say that the war-making branches of the Government did not have ground for believing that in a critical hour such persons could not readily be isolated and separately dealt with, and constituted a menace to the national defense and safety, which demanded that prompt and adequate measures be taken to guard against it." Likewise the Court pointed out that "the danger of espionage and sabotage, in time of war and of threatened invasion, calls upon the military authorities to scrutinize every relevant fact bearing on the loyalty of populations in the danger areas."

In the Hirabayashi case the Court also called attention to the fact that General DeWitt's Public Proclamation No. 1 recited that the entire Pacific Coast "by its geographical location is particularly subject to attack, to attempted invasion by the armed forces of nations with which the United States is now at war, and, in connection therewith, is subject to espionage and acts of sabotage, thereby requiring the adoption of military measures necessary to establish safeguards against such enemy operations." It further pointed out that this proclamation stated that "the present situation requires as matter of military necessity the establishment in the territory embraced by the Western Defense Command of Military Areas and Zones thereof"; also that said proclamation declared that " 'such persons or classes of persons as the situation may require' would, by subsequent proclamation, be excluded from certain of these areas, but might be permitted to enter or remain in certain others, under regulations and restrictions to be later prescribed."

In the course of a concurring opinion rendered in the Hirabayashi case, Mr. Justice Douglas observed: "We must credit the military with as much good faith in that belief (that among citizens of Japanese ancestry there were those who would give aid and comfort to the enemy) as we would any other public official acting pursuant to his duties. We cannot possibly know all the facts which lay behind that decision. Some of them may have been as intangible and as imponderable as the factors which influence personal or business decisions in daily life. The point is that we cannot sit in judgment on the military requirements of that hour. Where the orders under the present Act have some relation to 'protection against espionage and against sabotage', our task is at an end.

"Much of the argument assumes that as a matter of policy it might have been wiser for the military to have dealt with these people on an individual basis and through the process of investigation and hearings separated those who were loyal from those who were not. But the wisdom

or expediency of the decision which was made is not for us to review. Nor are we warranted where national survival is at stake in insisting that those orders should not have been applied to anyone without some evidence of his disloyalty. The orders as applied to the petitioner are not to be tested by the substantial evidence rule. Peacetime proceedures do not necessarily fit wartime needs, * * * Nor should the military be required to wait until espionage or sabotage becomes effective before it moves.

"It is true that we might now say that there was ample time to handle the problem on the individual rather than the group basis. But military decisions must be made without the benefit of hindsight. The orders must be judged as of the date when the decision to issue them was made. To say that the military in such cases should take the time to weed out the loyal from the others would be to assume that the nation could afford to have them take the time to do it. But as the opinion of the Court makes clear, speed and dispatch may be of the essence. Certainly we cannot say that those charged with the defense of the nation should have procrastinated until investigations and hearings were completed. At that time further delay might indeed have seemed to be wholly incompatible with military responsibilities."

■ Applying the foregoing views to the record before us the conclusion is inescapable that here the conditions confronting the Commanding General of the Western Defense Command and Fourth Army called for the exercise of judgment and discretion, and for the choice of means necessary for the protection of war materials and the members of the armed forces from injury and from the dangers which attend the rise, prosecution and progress of war, and likewise gave to such commander wide scope for the exercise of judgment and discretion in determining the nature and extent of the threatened injury or danger and in the selection of the means for resisting it. Here, too, we must keep in mind, as pointed out by the Supreme Court in the Hirabayashi case, that the basic facts determined by General Dewitt in the light of the knowledge available adequately supported his findings as set forth in his Public Proclamations Nos. 1 and 2 to the effect that danger existed from espionage and sabotage, not only on the part of enemy aliens but also on the part of some American citizens.

Likewise in the present suit we are not required to define the ultimate boundaries of the war power. We need to decide only whether the particular exclusion order under attack was and is within the boundaries of the war power. Again we need to determine only whether the circumstances within the knowledge of the Military Commander, charged with the responsibility for maintaining the National Defense with respect to the area comprising the Western Defense Command, afforded a rational basis for the decision he made in issuing said exclusion order. Whether this Court would have made it is irrelevant.

■ Taking into consideration the record in its entirety we cannot say that the Commanding General did not have ground for believing that plaintiff had committed acts of disloyalty, that he had engaged in a kind of leadership which might instigate others to carry on activities which would facilitate the carrying on of espionage and sabotage, and that his continued presence in the area from which he had been ordered excluded constituted a danger to the military security thereof.

■ As pointed out by Mr. Justice Douglas in the Hirabayashi case, when national survival is at stake we are not warranted in insisting on testing by the substantial evidence rule the decision of the Military Commander in issuing the Exclusion Order complained of herein. Again, as the justice there affirmed, peacetime procedures do not necessarily fit wartime needs; nor should the military in the present instance be required to wait until espionage or sabotage becomes effective before it moves. On the contrary, speed and dispatch may be of the essence.

Our attention has been called to the opinion rendered by the District Court for the Eastern District of Pennsylvania in its recent decision of the case of Schueller v. Drum, 51 F.Supp. 383. A study of that opinion persuades us that it affords no

ground for a decision of the present cause different than that pronounced herein.

Accordingly we conclude that plaintiff's application for an injunction must be denied, and that this suit must be dismissed. Likewise we are convinced that plaintiff without further delay should obey the Exclusion Order directed against him, as this Court will do nothing which might seem to interfere with the enforcement of such Order.