## DE WITT v. WILCOX.
### No. 11424.

Circuit Court of Appeals, Ninth Circuit.
March 28, 1947.

James M. Carter, U. S. Atty., and Ernest A. Tolin and Ronald Walker, Asst. U. S. Attys., all of Los Angeles, Cal. (Herbert E. Wenig, Major, J.A.G.D. U. S. Army, of San Francisco, Cal., of counsel), for appellant.

A. L. Wirin, of Los Angeles, Cal., Arthur Garfield Hays and Osmond K. Fraenkel, both of New York City, Nannette Dembitz, of Washington, D. C., Marion P. Ames and

Walter Gellhorn, both of New York City, and A. L. Wirin and Fred Okrand, both of Los Angeles, Cal., for appellee.

Before GARRECHT, DENMAN, MATHEWS, STEPHENS, HEALY, BONE, and ORR, Circuit Judges.

DENMAN, Circuit Judge.

General DeWitt appeals from a summary judgment of the district court awarding damages against him to appellee Wilcox in the stipulated sum of $100 for the re-moval of Wilcox on September 6, 1943, to Las Vegas, Nevada, from the latter's residence in San Diego, California, in the area of General DeWitt's Western Defense Command. The removal, by a captain and detail of soldiers under General DeWitt's orders, was pursuant to a prior order of General DeWitt of date December 28, 1942, ordering Wilcox to be excluded from the area of his Western Defense Command,[1] which order Wilcox had refused to obey.

The ground of the district court's decision is that, though the facts concerning Wilcox's subversive and dangerous activities warranted making him the subject of an, individual exclusion order, General DeWitt's action making the order effective by taking Wilcox out of the Western Defense Command area exceeded any war-waging powers given him by Congress or the President as Commander-in-Chief of the armed forces. The district court, in effect, held that there was no power in anyone so to remove Wilcox and that the sole remedy for Wilcox's refusal to remove himself from the prohibited area was a statute of Congress, Public Law No. 503, enacted March 21, 1942, 18 U.S.C.A. § 97a, under which Wilcox could be convicted of a misdemeanor for disobedience of the order and fined or imprisoned for not exceeding one year.

 We do not agree. The President Executive Order No. 9066, Feb. 19, 1942,

gave to General DeWitt the power to use his troops in enforcing his exclusion orders in the following language:

"I hereby further authorize and direct the Secretary of War and the said Military Commanders *to take such other steps as he or the appropriate Military Commander may deem advisable to enforce compliance with the restrictions applicable to each Military area hereinabove* authorized to be designated, *Including the use of Federal Troops* and other Federal agencies, with the authority to accept assistance of state and local agencies." (Emphasis supplied.)

Under Public Law No. 503, one Hirabaya-shi, an American citizen of Japanese descent, was convicted of a violation of the curfew order, also made by General DeWitt. In sustaining the conviction the Supreme Court, after a review of the legislative history of Public Law No. 503, stated:

"The conclusion is inescapable that Congress, by the Act of March 21, 1942, ratified and confirmed Executive Order No. 9066. * * *

"Both the Executive Order and the Proclamations were before Congress when the Act of March 21, 1942, was under consideration. * * *

"The act of March 21, 1942, was an adoption by Congress of the Executive Order and of the Proclamations." Hirabayashi v. United States, 1943, 320 U.S. 81, 91, 102, 103, 63 S.Ct. 1375, 1381, 87 L.Ed. 1774.

On March 20, 1942, Congress enacted and on March 21, 1942, the President approved Public Law No. 503, as follows:

"Public Law No. 503

"To provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones.

"Be it enacted by the Senate and House of Representatives of the United States of

---

[1] There is no denial to the complaint's allegation that the order of December 28, 1942, excluded Wilcox from the States of Arizona, California, Oregon and Washington, portions of the States of Florida, Alabama, Mississippi, Louisiana, Texas and New Mexico, and from the States of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, North Carolina, South Carolina, Georgia and the District of Columbia.

America in Congress assembled, That whoever shall enter, remain in, leave, or commit any act in any military area or military zone prescribed, under the authority of an Executive order of the President, by the Secretary of War, or by any military commander designated by the Secretary of War, contrary to the restrictions applicable to any such area or zone or contrary to the order of the Secretary of War or any such military commander, shall, if it appears that he knew or should have known of the existence and extent of the restrictions or order and that his act was in violation thereof, be guilty of a misdemeanor and upon conviction shall be liable to a fine of not to exceed $5,000 or to imprisonment for not more than one year, or both, for each offense."

■ This court takes judicial notice of the extraordinarily difficult and diverse problems confronting General DeWitt in his protection of the 1500 miles of Pacific Coast waters and adjacent areas in California, Oregon and Washington of his command and assumes that the intent of Congress is to be determined from their consideration. The protection was not only from attack by sea but also within his area from such major subversive acts of those of Wilcox, likely to cause sabotage and aid espionage, and from minor infractions of necessary regulations controlling the conduct of civilians generally.

Among these minor infractions are casual failures to dim automobile lights in control areas, where spies well could use lights to aid submarines or landing parties. In the former case prosecution for a misdemeanor is sufficient sanction. In the latter case of possible espionage of a person of dubious loyalty, exclusion may be the efficient rem-

edy. So also of the return of subversive persons excluded from the defense areas. The misdemeanor prosecution gave to the discharge of General DeWitt's multitudinous and exhausting duties the aid of one of the "other Federal agencies" of Executive Order No. 9066, the United States Attorneys, in such prosecutions.

It is apparent that a person ordered excluded or a returned excludee, during the period of a misdemeanor prosecution, would be entitled to bail and that he would be at large in the defense area and thus be free to exercise his subversive activities.[2]

The exclusion of some 100,000 persons of Japanese descent was contemplated in one of General DeWitt's proclamations, that of March 2, 1942—that is 19 days before Public Law No. 503 was enacted.[3] Neither General DeWitt nor Congress then knew whether the citizens of Japanese descent would obey the contemplated exclusion order or, like Korematsu,[4] refuse to obey the contemplated order because of its claimed unconstitutionality. It well could be expected that as many as 20,000 such citizens, including their wives, children and aged dependents, would refuse to leave their homes, farms and businesses for the stockades in the desert areas in which they were to be imprisoned. It cannot be that General DeWitt or Congress thought it an efficient protection for the war menace apprehended from disloyal persons in these thousands, that they would remain for months out on bail during the prosecution of a myriad of misdemeanor suits, crowding out all other litigation from our federal courts.

With such facts before Congress, its intent to supplement General DeWitt's powers of exclusion is apparent from the following statements in the House of Representatives with reference to the bill for

---

[2] It appears that Wilcox, after his removal order and before removal, was indicted and tried for treason (and, incidentally convicted) and during his prosecution, and even after conviction, was released on bail, thus throwing on General DeWitt the added burden of a military surveillance of Wilcox's activities.

[3] Civilian Exclusion Order No. 34 provided in part,

"1. Pursuant to the provisions of Pub-

lic Proclamations Nos. 1 and 2, this Headquarters, dated March 2, 1942, and March 16, 1942, respectively, it is hereby ordered that from and after 12 o'clock noon, P.W.T., of Saturday, May 9, 1942, all persons of Japanese ancestry, both alien and non-alien, be excluded from that portion of Military Area No. 1 described as follows: * * *"

[4] Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194.

Public Law No. 503, by Congressman Sparkman[5] and by Congressman Michener:

"Mr. Sparkman: Reserving the right to object, Mr. Speaker may I say that while our committee was out on the West Coast studying this problem, one of the first things General DeWitt called to our attention was the fact that even though he was given the authority to declare these to be restricted and prohibited areas, he had no way of enforcing the order *by penalty*, if anyone violated it. *All he could do was to move them off. If they came back, there was no penalty provided in the law.* He asked for this specific legislation. It is needed immediately because that evacuation is taking place now.

"Mr. Michener: Yes; that is in exact harmony with my first statement, that this bill simply *implements the Executive Order* which is now in force and effect." (Emphasis supplied.) 88 Cong. Rec., Pt. 2, p. 2730, 77 Cong. 2d Sess., March 19, 1942.

In Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194, the government contended that the exclusion order was separable from the rest of the evacuation process but some members of the Court agreed that exclusion and detention in an assembly center was inseparable.[6] While the majority opinion held that the order was separable and valid, it also declared that even if the exclusion order was inseparable from the forcible means by which it would be executed, nevertheless the order was valid.

"Some of the members of the Court are of the view that evacuation and detention in an Assembly Center were inseparable. After May 3, 1942, the date of Exclusion Order No. 34, Korematsu was *under com-pulsion to leave* the area not as he would choose but *via an Assembly Center*. The Assembly Center was conceived as a part of the machinery for group evacuation. *The power to exclude includes the power to do it by force if necessary.* And any forcible measure must necessarily entail some degree of detention or restraint whatever method of removal is selected. But whichever view is taken, it results in holding that the order under which petitioner was convicted was valid." 323 U.S. at pages 222, 223, 65 S.Ct. at page 197, 89 L. Ed. 194. (Emphasis supplied.)

Thus the decision of the Court was placed on either of two grounds: First, the civilian exclusion order was separable and constitutionally valid; second, treating the order as inseparable from the forcible means by which the order would be executed, nevertheless the order was valid.[7]

We hold that Congress by Public Law No. 503 merely implemented Executive Order No. 9066 by adding another method of enforcing General DeWitt's contemplated exclusion order. It did not emasculate from Order No. 9066 General DeWitt's power of using his soldiers for such an exclusion.

General DeWitt exercised this power with commendable caution and diligence.[8] He appointed a committee of officers to investigate the facts regarding Wilcox's activities. Wilcox was notified and appeared and offered his testimony. The board decided that his activities and viewpoint were not such as to make it necessary to exclude him. There was further investigation by the Federal Bureau of Investigation and by the Military Intelligence. As a result of these investigations both at the hearing

---

[5] A member of the Committee on Military Affairs which had reported out the bill with the recommendation that it be passed.

[6] Mr. Justice Frankfurter (Concurring Opinion, supra, 323 U.S. at page 224, 65 S.Ct. at page 197, 89 L.Ed. 194); Mr. Justice Roberts (Dissenting Opinion, supra, 323 U.S. at pages 226, 230, 65 S.Ct. at pages 198, 200, 89 L.Ed. 194); Mr. Justice Jackson (Dissenting Opinion, supra, 323 U.S. at page 243, 65 S.Ct. at page 206, 89 L.Ed. 194).

[7] Where a decision is thus placed on either of two grounds each ground must be taken as the judgment of the Court. Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 340, 48 S.Ct. 194, 72 L.Ed. 303; United States v. Title Insurance, 265 U.S. 472, 486, 44 S.Ct. 621, 68 L.Ed. 1110.

[8] His respect for the civil courts is shown by his two orders staying Wilcox's removal order of December 28, 1942 to September 6, 1943, during the pendency of the suit to enjoin Wilcox's deportation and that in which he was prosecuted for conspiracy.

and otherwise, General DeWitt had before him the following facts:

The reports of government intelligence agencies reveal a general seditious activity which would weaken morale and the ability of the nation to defend itself. This activity was carried on by Wilcox within Military Areas Nos. 1 and 2 as one of the principal leaders of "Mankind United." These reports show that Wilcox, after the United States was at war, organized and conducted meetings of persons for the purpose of convincing them that the war with Japan and Germany was started for the benefit of the "war lords" and that the war should be stopped by refusal to cooperate in the war effort and by other means which would prevent the United States from continuing in the war.

A bulletin dated January 1, 1942, entitled "Late News Flash" written by the Beacon Bureau of which Wilcox was manager and owner stated "Twice during the last 12 months, once in the last 15 days, the war could have been stopped if one out of four of our inactive registrant and enrolee co-workers and associates here on the Pacific coast and in three other parts of the world had bestirred themselves in their own behalf."

At a public meeting held on April 20, 1942, at Escondido, California, Wilcox stated " 'Mankind United' has means of rendering useless every method of modern warfare" and that " * * * We are going to strike simultaneously in several places. We are in a position to stop all manufacture of war equipment and dynamite the ammunition dumps. This is the only way the war can be stopped all over the world."

At another meeting held on March 5, 1942, in San Diego, intelligence reports show that Wilcox said " 'Mankind United' has things more potent and their equipment can do more in thirty days than anyone else can do in a whole year," and that "the bombing of Pearl Harbor was instigated and definitely traced to the White House in Washington."

As this court judicially knows, General DeWitt issued Public Proclamation No. 10, dated August 5, 1942 (7 F.R. 6631),

providing for a dim-out of lights in Military Areas Nos. 1 and 2 because "the Armed Forces of the enemy have made attacks upon vessels of the United States traveling along the Pacific Coastal waters and upon land installations within said Military Areas and it is expected that such attacks will continue." Dim-out regulations were therefore established within Military Areas Nos. 1 and 2 "to provide maximum protection for war utilities, war materials and war premises located within the States of Washington, Oregon and California, against enemy attacks by sea and by air."

At meetings held on August 12 and 13, 1942, Wilcox predicted that the government was going to completely scuttle the Constitution and that dim-out was only the beginning as to the restrictions which were going to come. At the same meeting one Edward Gibson, who was one of the "Mankind United" officials under the supervision of Wilcox, stated that the dim-out regulations and the rationing of gas and oil were merely to stop transportation and the main purpose was to get people used to being dictated to. He further stated, according to the report, that the dim-out was nothing but "damn foolishness" and the war lords were responsible for all of it.

The Assistant Chief of Staff, G-2, Headquarters, Western Defense Command, reported to the Civil Affairs Division in part as follows:

" 'Mankind United' during October developed a whispering campaign against the dimout regulations, gasoline and rubber rationing, the 35 mile per hour speed law, alleging that such regulations were unnecessary and an attempt on the part of the government to prevent freedom of assembly and freedom of speech. * * *

"It is believed that because of their recent seditious statements, 'Mankind United' is not only a racket and a seditious organization, but it is also the conscious or unconscious views of Axis propaganda in this area. The membership of the organization continues to grow and its leaders are extremely active throughout the State of California. It is the hub of rumor spreading and its members are so fanatical that very little persuasion on the part of the leaders might very well result in direct sabotage

by the members against the war effort of the United States."

Previously on November 21, 1942, the same source reported "Homer G. Wilcox, manager of the San Diego branch of 'Mankind United' is one of the most active and dangerous members of the organization."

At the time of Wilcox's removal, General DeWitt had under his protection from espionage and sabotage involving espionage what the Supreme Court describes in Hirabayashi v. United States, 320 U.S. 81, 95, 63 S.Ct. 1375, 1383, 87 L.Ed. 1774, as "* * * a vast concentration, within Military Areas No. 1 and 2, of installations and facilities for the production of military equipment, especially ships and airplanes. Important Army and Navy bases were located in California and Washington. Approximately one-fourth of the total value of the major aircraft contracts then let by Government procurement officers were to be performed in the State of California. California ranked second, and Washington fifth, of all the states of the Union with respect to the value of shipbuilding contracts to be performed."

Some of the largest California airplane plants were in San Diego where Wilcox resided, and all of them within 100 miles to the north.

With such facts before him, General DeWitt nevertheless refrained from acting on his authority as Commander of the Military Areas. Instead he recommended such action to General Marshall, the Chief of Staff.[9] The Secretary of War and the Chief of Staff themselves determined, after a review of the current military situation and the facts pertaining to Wilcox, that the exclusion should be so directly enforced as a means of preventing espionage and sabotage and preserving the military security of the military areas concerned.

■ There is no merit in Wilcox's contention that General DeWitt's action was not reasonably related to the prevention of sabotage and espionage. As found by the court below:

"The manufacture of military supplies, the movement of ships, men and materials from the Pacific Coast ports to the Pacific battle fronts, and the use of California ports by Naval vessels for repair and outfitting presented a likelihood of espionage and sabotage which made the prevention of sabotage and espionage within Military Areas Nos. 1 and 2 a matter of military necessity."

Such facts were also adduced in the trial of a case brought by Wilcox aganist General DeWitt in the Southern District of California, in which Judge Hollzer denied an injunction against his deportation. Wilcox v. DeWitt, 1943, D.C., 71 F.Supp. 704. We agree with the finding made in that case.

"That the evidence concerning plaintiff's activities and associations provided a reasonable ground for the belief by defendant, Lt. Gen. John L. DeWitt, that plaintiff had committed acts of disloyalty and was engaged in a type of subversive activity and leadership which might instigate others to carry out activities which would facilitate the commission of espionage and sabotage and encourage them to oppose measures taken for the military security of Military Areas Nos. 1 and 2, and that plaintiff's presence in the said areas from which he had been excluded would increase the likelihood of espionage and sabotage and would constitute a danger to the military security of those areas."

General DeWitt also claims that the decision made in that case is res judicata of the issue here, a contention opposed by Wilcox. The district court below held with General DeWitt. It is not necessary to resolve that dispute since this finding of the district court otherwise may be sustained. Cf. Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 89, 63 S.Ct. 454, 87 L.Ed. 626. On the record here the evidence is as convincing as in the case of Korematsu v. United States, supra, that General DeWitt had a basis in fact from which he could rationally conclude that Wilcox should be ordered excluded and

---

[9] General DeWitt also contends that even if not specifically authorized to remove Wilcox, his acts in such demonstrated caution and good faith do not subject him to civil liability—a contention we need not consider since we hold his action was within his war powers.

that the order should be made effective by removal by the soldiers.

Wilcox contends that, even conceding the exclusion order is valid and that the misdemeanor penalty is not the exclusive remedy, nevertheless he is entitled to all the peace time protection of due process before his actual deportation to secure compliance with the order. He contends that such due process was denied him in the hearing before the board of officers because he was not apprised of evidence against him, already received by the board, and the persons giving information against him were not produced for his cross-examination.

We do not agree that because General DeWitt accorded Wilcox such a hearing he injected into his summary powers the restraints of peace time. In the Korematsu case, without such a hearing, upwards of 70,000 American citizens of Japanese descent were held to be legally ordered to be excluded. The hearing by the board of officers was but an added precaution accorded Wilcox, not an act divesting General DeWitt of the military discretionary powers. Since we have held that General DeWitt had the power forcibly to exclude anyone legally ordered excluded, his exercise of the latter power was within his same military discretion as in making the exclusion order for the Japanese descended citizens.

The summary judgment is reversed and the case remanded to the district court with instructions to enter a judgment for the defendant DeWitt.

MATHEWS, Circuit Judge, concurs in the result.