**NATIONAL LABOR RELATIONS BOARD v. HUDSON MOTOR CAR CO.**

No. 9121.

Circuit Court of Appeals, Sixth Circuit.

June 3, 1942.

---

[3] Wyche v. Clapp, 43 Tex. 543, 548.

[4] Page on Wills, 2nd Ed., § 87.

Malcolm F. Halliday, of Washington, D. C. (Robert B. Watts, Ernest A. Gross, Gerhard P. Van Arkel, David Findling, Dominick L. Manoli, and Malcolm F. Halliday, all of Washington, D. C., on the brief), for petitioner.

Albert E. Meder, of Detroit, Mich. (Beaumont, Smith & Harris, Albert E. Meder, and Yates G. Smith, all of Detroit, Mich., on the brief), for respondent.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

The Board ordered the respondent, the Hudson Motor Car Company, to cease and desist from discouraging membership in International Union, United Automobile Workers of America, Local 154, an affiliate of the American Federation of Labor, or any other labor organization of its employees, and from discriminating in regard to hire or tenure of employment or any terms or conditions of employment.

It ordered the respondent to cease and desist from interfering with, restraining or

coercing its employees in any other manner, in the exercise of their right to self-organization to form or join labor organizations, to bargain collectively or to engage in concerted activities for the purpose of collective bargaining. The Board ordered the full and immediate reinstatement to their former positions or to positions substantially equivalent thereto without prejudice to any of their rights and privileges of the following employees:

James Gordon Wilson, Clifton K. Jones, William McDonald, George Gallant, Arthur E. Blower, James O'Neill, James Henry Brown, Percival Joseph Denesha, Zoley Morgan, Leonard Sullivan and Frank Sipple and to make each whole for any loss of pay suffered by reason of discrimination against him by paying to each a sum equal to the amount normally received by him from the date of respondent's alleged discrimination against him to September 21, 1940, and from the date of the order to the date of respondent's offer of reinstatement, less net earnings, if any, during said time. The Board ordered the posting of appropriate notices in conspicuous places in its plant for a period of sixty days.

Respondent resists enforcement of the Board's order solely on the ground that the Board's findings of fact are not supported by substantial evidence. The tendered issue requires such an outline of the primary facts as will sufficiently reflect the ultimate facts.

Respondent is a Michigan corporation, with its general offices and plants located at Detroit, Michigan, and is in the business of manufacturing finished automobiles, automobile parts and automobile chassis. The facts concerning the unfair labor practices charged pertain to the respondent's main plant which is devoted to machine assembly and shipping operations. It also operates two other plants, one of which is used for stamping body assembly and painting and the other for machinery and service parts. All three plants are so interrelated as to constitute a continuous process of manufacturing which ends in the main plant.

At the time of the unfair labor practices which the Board found to exist, respondent employed approximately 10,000 persons. In July 1936, the International Union, United Automobile Workers of America, originally an affiliate of the American Federation of Labor, issued a charter to a labor organization of respondent's employees which is designated in the record as "Hudson Local No. 154." In July of the same year, the parent organization transferred its affiliation to the Committee for Industrial Organization. A few months later the American Federation of Labor suspended the International Union and on November 16, 1938, the Congress of Industrial Organization, successor to the earlier C. I. O. granted a charter to the I. U. U. A. W. A. In April 1937, the C. I. O. caused a sitdown strike in respondent's plant which ultimately was settled by the respondent granting Local 154, C. I. O., recognition as collective bargaining agent for its members. Thereafter, petitioner following proceedings under Section 9 of the Act, certified Local 154, C. I. O., as the exclusive representative of all respondent's employees in an appropriate bargaining unit which included all of respondent's employees except supervisory officials, foremen, straw bosses and other salaried employees. See Matter of Hudson Motor Car Company and Local 154, International Union, United Automobile Workers of America, C. I. O. affiliate, 8 N.L.R.B. 1080.

In November 1938, respondent and Local 154, C. I. O., entered into a further collective bargaining contract and by its terms the local was granted exclusive recognition as a bargaining agent for all of respondent's employees, which contract was effective during the period of time here in controversy but did not provide for a closed shop.

In January 1939, some of the members of the International Union, United Automobile Workers of America, commenced a campaign to take that organization into the A. F. of L. and Local 154, C. I. O., was infected with this struggle. The effort was abortive in the local and culminated in practically all of appellant's employees remaining with the C. I. O. and respondent continued to deal with the officers and stewards of that organization as the exclusive bargaining representatives of its employees.

Respondent's contract with Local 154, C. I. O., provided inter alia that "neither the Union nor its members will intimidate or coerce employees, and also agrees not to solicit membership or dues on company time or plant property. * * * Union headquarters is the regular place for payment of dues but the company agrees that the voluntary payment of dues on plant property, provided work is not interrupted, will not be considered a violation of the above pro-

visions." The contract further provided "that a chief shop steward or designated executive officer, in order to investigate or adjust grievances may, when necessary, leave his department, but before doing so must personally notify his foreman."

Comparatively few of respondent's employees continued with the A. F. of L. and the uncontradicted evidence shows that during the period from May to September 1939 representatives of Local 154, C. I. O., openly solicited these members in the plant of respondent during working hours and in many instances threatened them with physical violence and ejection from the plant, if they did not become members of the C. I. O. Some of them appealed to respondent's supervisory officials for protection and were informed there was nothing the Company could do because it would have a complete shut down if any disciplinary measures were taken against the C. I. O. members. The collection of dues by the C. I. O. from its members while the plants were in operation, as well as the solicitation and intimidation of the A. F. of L. members was carried on in the presence of respondent's foremen and plant protection men. In some instances the solicitors, by physical force, compelled the employees who were members of A. F. of L. to stop work while being threatened with violence if they did not join the C. I. O.

On several occasions respondent's foremen told its A. F. of L. employees that they were in the wrong group and if they would join the C. I. O. faction all trouble in the plant would be eliminated and they would have peace.

Shortly before the annual shut down for change of models early in July 1939, a committee representing Local 154, C. I. O., notified respondent's agent in charge of the operation of its plants that the C. I. O. members refused to work with members of the Local 154, A. F. of L. Respondent's personnel director immediately instructed the A. F. of L. members to cease from carrying on any activity that would aggravate this situation and warned them that they were not to pass out any literature or union buttons or to collect dues during working hours, or on the premises of respondent at any time. The personnel director also told the C. I. O. committee, that their activities against the A. F. of L. would have to cease. However, no disciplinary measures were taken at any time by the respondent to prevent the members of the C. I. O. from annoying, harassing or interfering with the members of the A. F. of L. After the personnel director had instructed the A. F. of L. members to refrain from engaging in union activities in the plant, he discharged one of them for a violation of his instructions, but no similar action was taken against the C. I. O. members, although their activities became more vigorous. The internecine struggle in respondent's plant between the adherents of the C. I. O. and A. F. of L. continued with unabated fury from January to September 1939 when it culminated in the C. I. O. members "ganging up" on the A. F. of L. members, and by physical violence ejecting them from respondent's plant without any protection or protest from respondent's supervisory employees, who were aware of the struggle and witnessed many of the incidents thereto.

From 1937 down to and including 1939, the C. I. O. adherents had called repeated strikes in respondent's plants and had organized and conducted riots and its "goon squads" had committed assaults on A. F. of L. members and the officers of Local 154, C. I. O. had at all times protested to the respondent against the employment of any A. F. of L. member in its plant.

The respondent does not dispute the foregoing résumé of the evidence but insists that it was powerless to furnish the A. F. of L. members any sort of protection and that even a threat of disciplinary measures against the offending C. I. O. members would have caused a strike and a consequent shut down of its plant and that it was impossible to avoid physical violence and intimidation being used by its C. I. O. employees toward the eleven members of the A. F. of L. while they worked in the plant.

The uncontradicted evidence shows that respondent has at all times been willing to employ the persons which the Board's order requires it to reinstate to their former or substantially equivalent positions but respondent insists that if such persons are reinstated it is powerless to prevent the C. I. O. members from annoying, harassing, molesting or disturbing them and that it cannot prevent the threat of physical violence against such persons or the execution thereof.

█ On questions of fact, the Board's determination or finding must be accepted by us as final. We may search the record for substantial evidence and set the Board's

532

order aside if such evidence be lacking. The phrase "substantial evidence" is far from precise and means more than a scintilla and less than the weight of evidence. The Board's finding must be upheld unless clearly arbitrary, or unless it is not confirmed by such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," regardless of the evidence on the other side. Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. One other factor relevant to the application of the substantial evidence test deserves mention. There are so-called "primary facts," matters which can be established by direct testimony, and there are "ultimate facts" which must be arrived at by a process of inferences from the primary facts. For example, the question of whether or not respondent in the case at bar lent its aid to 154 C. I. O., is a primary fact but the question of whether or not respondent lent such aid because it preferred this organization to 154 A. F. of L. or because it felt compelled to do so to prevent the loss and destruction of its business, depends upon a series of inferences from the primary facts. The conclusion as to whether or not respondent violated Section 8 (1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158, subds. (1, 3), depends upon the factual inferences from the primary facts. National Labor Relations Board v. Columbian Enameling & Stamping Company, 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660. The record discloses that there was substantial evidence from which the Board could have concluded that respondent's aid to 154 C. I. O., and its seeming acquiescence in the forcible ejection from its plant by the C. I. O. adherents of the members of 154 A. F. of L. was motivated by its belief that any other course would bring about destruction of its property with a strike and resultant turmoil in its business. There was also substantial evidence from which the Board could conclude that respondent's reason for aiding the C. I. O. affiliate and permitting violence to the members of the A. F. of L. affiliate, was because respondent had at the time a collective bargaining agreement with the C. I. O. affiliate, making it the exclusive agency for its employees and that it wished to make the contract effective as a closed shop agreement.

■ It is thoroughly settled by the Supreme Court decisions that the courts are precluded from weighing evidence when reviewing the Board's orders and if the findings of the Board are supported by evidence, the courts may not set them aside even though the Board could have drawn different inferences from the primary facts. National Labor Relations Board v. Nevada Consolidated Copper Corporation, 62 S.Ct. 960, 86 L.Ed. ——, decided April 27, 1942.

■ It is also settled by the Supreme Court that it is an unfair labor practice under the National Labor Relations Act for an employer to cooperate with unions representing an uncoerced majority of its employees for the purpose of securing new members.

■ The present contract is the antithesis of a closed shop agreement; therefore, it follows that respondent committed an unfair labor practice in lending aid to the C. I. O. affiliate and discouraging membership in the A. F. of L. affiliate. National Labor Relations Board v. Electric Vacuum Cleaner Company, Inc., and International Molders' Union of North America, Local 430, et al., 62 S.Ct. 846, 86 L.Ed. ——, decided March 30, 1942.

■ It is clear from the record in the case at bar that respondent is the victim of "no mere quarrel among kites and crows" and that it was compelled by force of circumstances to take sides in a controversy not of its making or liking. However, the National Labor Relations Act imposes on the employer the obligation to avoid participating in any way in the formation or conduct of a labor union among his employees and when a controversy arises between competing unions, he must remain neutral, unless pursuant to the provisions of the Act, he has theretofore entered into a written contract with a labor organization providing for a closed shop.

■ Respondent's contention boils down to the proposition that it was forced to favor the C. I. O. and that under the circumstances here present, it was not a free agent in the premises and therefore should not be charged with a violation of the Act because it had no intent to violate any of its terms. We think such an argument should be submitted to the Congress and not to us. Whether or not the Congress may deem it wise to protect the employer against labor strife which he does not incite or encourage is a problem with which we are without power to deal, it being the duty of

the court to administer the law as it finds it. We think it right and just to say that so far as the record shows, respondent has not wilfully violated the provisions of the Act, but the intent of the employer is not within the ambit of our power of review. When it is once made to appear from the primary facts that the employer has violated the express provisions of the Act, we may not inquire into his motives.

Respondent urges on us that in no event should the Board's order to offer reinstatement with back pay to the employees forcibly ejected from its plant be enforced. Its contention is predicated on the fact that it has at all times been willing to furnish employment to the ejected employees and that such employees lost their positions as the result of a schism in a labor organization which created two rival factions whose attitude toward one another was characterized by extreme bitterness and animosity and that respondent allowed said employees to return to work after they had been ejected once, whereupon the employees in the plant who were members of the C. I. O. affiliate stopped work and again ejected such persons from respondent's plant.

Respondent also urges that it took all reasonable steps to stop these evictions and that neither its supervisory employees nor plant protection men had any means at their disposal which they could have used in any way to prevent the mistreatment of its employees who were members of the A. F. of L. affiliate by their co-employees who were members of the C. I. O. affiliate.

 Section 10 (c) of the Act authorizes the Board "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this act [chapter]." The questioned provision of the Act was not to reward the employee, but to serve in a measure as a punishment of the employer's violation of the Act. Therefore, a court on review of the Board's order lacks the power to apply a construction of the Act on the basis of what it believes might be just between employer and employees but must carry out the intent of the Congress regardless of where the burden may fall.

It must be remembered that the protection of the worker's right to self-organization under the provisions of the Act in no way interferes with the freedom of the employer to enforce such rules and orders as are necessary to the proper conduct of his business so long as the supervision of the employer is not for the purpose of intimidating or coercing his employees with respect to their self-organization and representation.

The present record is barren of any evidence that respondent took any steps to prevent the members of the C. I. O. affiliate from committing assaults on the persons of the respondent's employees who were ordered reinstated by the Board with back pay. The record is also barren of any evidence that any one of such persons committed any violation of respondent's rules, orders or regulations for the conduct of its business.

The Board having found that the respondent had engaged in an unfair labor practice as defined under the National Labor Relations Act and its findings in this respect being supported by substantial evidence, the remedy to be applied for the violation was for the Board to decide, and the remedy it chose in the case at bar being within the ambit of the statute, we lack the power to substitute our judgment for that of the Board. Phelps Dodge Corporation v. National Labor Relations Board, 313 U. S. 177, 198, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217.

The petition for enforcement of the order is granted.