JOINT COUNCIL DINING CAR EMPLOYEES et al., Appellees.

No. 19108.

United States Court of Appeals
Fifth Circuit.

April 10, 1962.

Allen G. Siegel, Marion Shepard and Sidney E. Lewis, Jacksonville, Fla., for appellant.

Lawrence Renfroe, Tallahassee, Fla., Morton H. Silver, Miami, Fla., Clark W. Toole, Jr., Ragland, Kurz, Toole & Martin, Jacksonville, Fla., for appellee, Atlantic Coast Line Railroad Co.

Claude Pepper Law Offices, Tallahassee, Fla., for intervenor-appellee.

Before TUTTLE, Chief Judge, and BROWN and BELL, Circuit Judges.

EMPLOYING LITHOGRAPHERS OF GREATER MIAMI, FLORIDA,
Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

AMALGAMATED LITHOGRAPHERS OF AMERICA and Local 78, Amalgamated Lithographers of America, Respondents.

Nos. 18988, 18853.

United States Court of Appeals
Fifth Circuit.

March 29, 1962.

No. 18858: Helen F. Humphrey, Washington, D. C., Leonard B. Sand, Matthew Silverman, New York City, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Dominick L. Manoli, Assoc. Gen. Counsel, N. L. R. B., Samuel M. Singer, Atty., N. L. R. B., Washington, D. C., for respondent.

No. 18988: Dominick L. Manoli, Assoc. Gen. Counsel, N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Samuel M. Singer, Atty., N. L. R. B., Washington, D. C., Stuart Rothman, General Counsel, Vivian Asplund, Attorney, National Labor Relations Board, for petitioner.

Leonard B. Sand, New York City, Helen F. Humphrey, Washington, D. C., Matthew Silverman, New York City, Benjamin M. Robinson, General Counsel, New York City, Robinson, Silverman, Pearce & Aronsohn, New York City, for respondents, Amalgamated Lithographers of America and Local 78, Amalgamated Lithographers of America.

Before JONES, BROWN, and BELL, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge.

These cases are before the Court upon the petition of the Employing Lithographers of Greater Miami, Florida, an association of several Employers herein called Employer, to review and modify an order of the National Labor Relations Board, and upon the petition of the Board for enforcement of its order against Amalgamated Lithographers of

America, and Local 78, Amalgamated Lithographers of America, herein called the Union. We allowed the Union to intervene in case No. 18,858, and upon motion consolidated the cases.[1]

The Board found that the Union violated Sections 8(b) (3) and 8(b) (4) (i) and (ii) (A) [2] of the Act by inducing the employees here involved to engage first in a refusal to work overtime, and later in a full strike with the objective of forcing the inclusion in their contract with the Employer of "Trade Shop" and "Refusal to Handle" clauses proscribed by Section 8(e) of the Act, as amended, despite the proposed "Separability" clause. The Board found the "Struck Work", "Chain Shop" and "Right to Terminate" clauses which the Union sought to include to be lawful. The Employer contends that the latter clauses are within the proscription of the Act while the Union asserts that none of the clauses in question are proscribed, and in the alternative, if proscribed, then Section 8(e) [3] of the Act is unconstitutional.

All facts are stipulated. The Union entered into a collective bargaining agreement with the Employer under date of September 1, 1957 to expire on February 29, 1960. On December 29, 1959 the Union notified the employer of its desire to terminate the agreement on

1. The decision and order of the Board were issued on March 1, 1961 and are reported at 130 NLRB No. 107. This Court has jurisdiction under Section 10 (e) and (f) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(e) (f), the events forming the subject matter of the case having transpired in Miami, Florida, within this judicial circuit.

2. Section 8(b) (3), 29 U.S.C.A. § 158(b) (3), provides:

"It shall be an unfair labor practice for a labor organization or its agents—

  *   *   *   *   *

"(3) To refuse to bargain collectively with an employer, * * *."

Section 8(b) (4), as amended, in pertinent part provides:

"It shall be an unfair labor practice for a labor organization or its agents—

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or

"(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

"(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by Section 8(e) of this section."

3. Section 8(e), 29 U.S.C.A. § 158(e), the hot-cargo clause amendment to the Taft-Hartley Act enacted as a part of the Labor-Management Reporting and Disclosure Act of 1959, is as follows:

"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided further*, That for the purposes of this subsection and subsection (b) (4) (B) of this section the terms 'any employer', 'any person engaged in commerce or an industry affecting commerce', and 'any person' when used in relation to the terms 'any other producer, processor, or manufacturer', 'any other employer', or 'any other person' shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further*, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception."

the termination date and to meet for the purpose of negotiating a new contract. Between January 20, 1960 and April 22, 1960 representatives of the Union and Employer met eighteen times in negotiating sessions.[4]

Shortly after negotiations began the Union demanded the inclusion in the contract of the six clauses which are the subject matter of this appeal. Beginning on March 2 the Union induced the employees to engage in a refusal to work overtime notwithstanding the requirement of the employer. On several occasions the employer requested the Union to lift the overtime ban, but to no avail. The Union then caused the refusal to work overtime to be converted into a full strike by inducing the employees to walk out and refuse to perform any services, and several days later set up picket lines at the struck establishments. It was stipulated that an object of the refusal to work overtime and the strike was to require the Employer to enter into contracts containing the six disputed clauses. After issuance of the complaint herein, the Regional Director sought injunctive relief against the Union under Section 10($l$) of the Act, 29 U.S.C.A. § 160($l$), and the Union entered into a stipulation, approved by the District Court, withdrawing the disputed contract demands for so long as the stipulation remained in effect and unmodified by the court. All parties waived hearing before a Trial Examiner and agreed that the Board might make findings of fact and conclusions of law on the basis of the allegations in the original complaint as admitted in the answer, the allegations in the first and second amendments to the complaint to which no answers were filed, and the stipulated facts.

Before reaching the question of the legality of these clauses, we con-sider the assertion of the Union that Section 8(e) is unconstitutional in any event and therefore the order of the Board cannot stand.[5]

Section 8(e) contains two exemption provisos, one exempting the construction industry from the application of the section alone, and the other exempting the apparel and clothing industry from the application of it and also Section 8(b)(4)(B). We put aside the exemption of the construction industry for it is conceded that special circumstances existed to support it and that there are basic differences between the lithographic industry and the construction industry. Indeed, it was conceded that special circumstances existed to support the exemption of the apparel and clothing industry. The constitutional attack is based on the narrow ground that the garment industry and the lithographic industry have similarly integrated processes of production. Thus, it is urged, the lithographic industry should have been granted the same exemption, and Section 8(e) is therefore unconstitutional as a violation of the due process clause of the Fifth Amendment to the Constitution.

The Union recognizes that it carries a heavy burden in bringing its attack under the due process provision of the Fifth Amendment. Unlike the Fourteenth Amendment it contains no equal protection clause. Currin v. Wallace, 1938, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; Steward Machine Co. v. Davis, 1937, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279. Of course, it does restrain such gross discriminatory legislation as amounts to a denial of due process. Hirabayashi v. United States, 1943, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774; and Bolling v. Sharpe, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884. This question before

---

4. Until March 7, 1960 the Miami Post was a member of the Employing Lithographers Association but withdrew on that date from membership and thereafter conducted separate negotiations with the Union.

5. The Board did not consider the constitutionality of Section 8(e), taking the position that it must assume the constitutionality of an Act it is required to administer in the absence of a binding court decision to the contrary. Rite Form Corset Company, Inc., 1947, 75 NLRB 174.

us then is whether the exemption of the garment and apparel industry is so grossly discriminatory or arbitrary as to be violative of due process when related to the lithographic workers.

In Hirabayashi, involving a curfew imposed during World War II alone on citizens of Japanese ancestry, the court, citing Keokee Consol. Coke Co. v. Taylor, 1913, 234 U.S. 224, 34 S.Ct. 856, 58 L.Ed. 1288, stated that Congress may hit at a particular danger where it is seen, without providing for situations which are not so evident or urgent.

In Keokee, a Virginia statute forbidding payment to workers by certain classes of employers by any order unless redeemable for its face value in lawful money of the United States was upheld. Mr. Justice Holmes speaking for a unanimous court said:

"It is more pressed that the act discriminates unconstitutionally against certain classes. But while there are differences of opinion as to the degree and kind of discrimination permitted by the 14th Amendment, it is established by repeated decisions that a statute aimed at what is deemed an evil, and hitting it presumably where experience shows it to be most felt, is not to be upset by thinking up and enumerating other instances to which it might have been applied equally well, so far as the court can see. That is for the legislature to judge unless the case is very clear." (p. 227, 34 S.Ct. p. 857)

In National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, the court reiterated the familiar rule that the cardinal principle of statutory construction is to save and not to destroy and that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act. And in Currin v. Wallace, supra, it was said:

"We have repeatedly said that the power given to Congress to regulate interstate and foreign commerce is 'complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution'. Gibbons v. Ogden, 9 Wheat. 1, 196 [6 L.Ed. 23]. To hold that Congress in establishing its regulation is restricted to the making of uniform rules would be to impose a limitation which the Constitution does not prescribe. There is no requirement of uniformity in connection with the commerce power * * *.

" * * * It is of the essence of the plenary power conferred that Congress may exercise its discretion in the use of the power. Congress may choose the commodities and places to which its regulation shall apply. Congress may consider and weigh relative situations and needs. Congress is not restricted by any technical requirement but may make limited applications and resort to tests so that it may have the benefit of experience in deciding upon the continuance or extension of a policy which under the Constitution it is free to adopt. As to such choices, the question is one of wisdom and not of power."

Legislation lacking in uniformity has been upheld many times. Cf. Hirabayashi, supra; Currin v. Wallace, supra; Steward Machine Co. v. Davis, supra; Detroit Bank v. United States, 1943, 317 U.S. 329, 63 S.Ct. 297, 87 L.Ed. 304; and Sunshine Anthracite Coal Co. v. Adkins, 1939, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263. And in Sonzinsky v. United States, 1936, 300 U.S. 506, 57 S.Ct. 554, 81 L.Ed. 772, inquiry by the courts into the hidden motives which may have moved Congress to exercise a power constitutionally conferred upon it was forbidden. That Congress had the power to act is clear and the inquiry here regards only discrimination against the lithographic workers.

To show arbitrariness violative of due process the Union relies on the statement in the Conference Report of the House

Managers that the exception of the apparel and clothing industry had been granted and that no other industry was included regardless of whether similar integrated processes of production may exist.[6]  1 Leg.Hist. (Gov't.Print.Off., 1957), 944.

Standing alone this would indicate arbitrariness but the legislative history makes it abundantly clear that reference to the integrated work processes in the garment industry was a limited and somewhat inadequate way of expressing the broader intent and design of Congress to protect an industry peculiarly subject to poor working conditions. It was formerly a sweat shop industry, employing many people but concentrated to a few locations. The firms responsible for the manufacture of clothing and apparel, called jobbers, design and cut the goods but farm out to others, called contractors, the necessary sewing and pressing. The contractors sublet to others. The contractors were formerly fiercely competitive, seeking advantages through forcing down wages and substandard working conditions. They were constantly changing, and difficult to organize. The vast improvement in working conditions in the industry was brought about through agreements between jobbers and the unions requiring the jobbers to farm out their work only to contractors operating on union standards, and to otherwise police the indus-

try.  2 Leg.Hist., supra, pp. 1195, 1384, 1385, 1387, 1446, 1577, and 1833. The conferees were of one accord that the garment and apparel industry was peculiar in this respect, and rejected an exemption for the coal industry. 2 Leg. Hist. 1378, 1387, 1708. Congress was aware that trade union agreements in the printing industry contained hot cargo clauses. 2 Leg.Hist. 1581. The authors of the Bill considered the exemption unnecessary. They viewed the industry as exempt under the "ally" doctrine wherein those employers in the production process were considered to be a single employer. They subscribed in whole to this interpretation of the Taft-Hartley Act by Senator Taft. 2 Leg.Hist. 1680–1681.

We are satisfied that the necessary modicum of justification for the statutory classification here is present, and that the exemption of the garment industry as distinguished from the lithographic industry by Congress in the exercise of its plenary power under the commerce clause was based on reasonable considerations.[7]  It was a valid congressional exercise of the commerce power. We hold that the exemption does not deny due process under the Fifth Amendment to the members of the union here. It may be that the lithographic workers can make a case for exemption but that is a matter that addresses itself under our system of government to the wisdom of

---

6. Another indication, though not evidence, of an arbitrary disregard of others in the class of the garment workers is the statement by Professor Archibald Cox, now Solicitor General of the United States, who was an advisor to Senator Kennedy during the consideration of this legislation by the Congress, that the apparel industry was excepted because the prohibition there would have raised havoc, and that Congress had no information about the prevalence or use of similar "hot cargo" clauses in other industries, or about their impact upon employers and their importance to union organization. He stated that "the majority was content to make the loose assumption that a clause which was contrary to public policy in the transportation indus-

try must be equally undesirable in other segments of the economy. Cox, The Griffin-Landrum Amendments to the National Labor Relations Act, 44 Minn.L. Rev. 257, 273 (1959). Another author has attributed the exemption to the squeaking wheel theory. Aaron, the Labor-Management Reporting and Disclosure Act of 1959, 73 Harv.L.Rev. 1086, 1121 (1960).

7. Cf. the discussion of exemptions of certain types of employees under various Acts of Congress in National Labor Relations Board v. Edward G. Budd Mfg. Co., 6 Cir., 1948, 169 F.2d 571, cert. den. Foreman's Ass'n of America v. Edward G. Budd. Mfg. Co., 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441.

the Congress. In the meantime we preserve the prescription of the statute, and the exemption to the garment workers.[8]

We turn now to the petition of the Employer to modify. It involves only the Chain Shop and Struck Work clauses, and the Right to Terminate clause which supplements the Struck Work clause by permitting termination of the contract by the Union in the event the company requests any employee to handle struck work.[9]

In logical sequence these clauses are:

## "STRUCK WORK

"Section 19. The Company agrees that it will not render production assistance to any lithographic employer, any of whose plants is struck by any local of the Amalgamated Lithographers of America or the International, or where members of any such Local or the International are locked out, and accordingly agrees that in implementation of this purpose the employees covered by this contract shall not be required to handle any lithographic work farmed out directly or indirectly by such employer, other than work which the employer herein customarily has performed for the employer involved in such strike or lock-out."

## "RIGHT TO TERMINATE

"Section 21. In the event the Company requests any employee to handle any work described in Section 19 above, the Union, in addition to the other rights and remedies the employees and the Union have under this contract or the law, shall have the right in its discretion to terminate the contract forthwith by giving written notice to the company."

## "CHAIN SHOP

"Section 20. Each Company agrees that its employees shall not be requested to handle any work in the plant covered by this contract if in another lithographic plant which is wholly owned and controlled by the company or commonly owned and controlled, in any part of the United States or Canada, any Local of the Amalgamated Lithographers of America is on strike, or members of such Local or International are locked-out."

The secondary boycott provision added by the 1947 Taft-Hartley Amendments to the Act, 29 U.S.C.A. § 158(b) (4) (A), was designed to preserve the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes, and to shield unoffending employers and others from controversies not their own. N. L. R. B. v. Denver Bldg. & Construction Trades Council, 1951, 341 U.S. 675, 692, 71 S. Ct. 943, 95 L.Ed. 1284; and to prevent coercive economic pressures against neutral secondary employers. Superior Derrick Corp. v. N. L. R. B., 5 Cir., 1960, 273 F.2d 891. In the interval between passage of this legislation and the 1959 amendments, labor organizations, because the statute was aimed only at union inducement of employees, circumvented the secondary boycott prohibition by exacting so-called "hot cargo" agreements from employers under which the employers voluntarily relinquished their freedom to handle or provide goods for employers or to render services to employers whom the contracting union considered "unfair". Local 1976, United Bro. of Carpenters, etc. v. N. L. R. B., 1958, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed. 2d 1186.

The 1959 amendments were addressed to the prevention of any circumvention of the secondary boycott provision, and made unlawful "any contract or agreement, express or implied" whereby any employer agrees not to handle products

---

8. This accords with the excellent opinion of Judge Sweigert on this question in Brown v. Local No. 17, Amalgamated Lithographers of America, N.D., Cal., 1960, 180 F.Supp. 294.

9. A portion of the Refusal to Handle clause held invalid by the Board complements the Struck Work clause and it will be hereinafter treated.

of another employer, or agrees to cease doing business with any other person, and made a strike to achieve such an agreement an unfair labor practice.

The Board found that the Struck Work clause did not, on its face, violate Section 8(e) because it amounted to nothing more than the "ally" doctrine preserved under the Act.[10] Douds v. Metropolitan Federation of Architects, S.D.N.Y.1948, 75 F.Supp. 672; N. L. R. B. v. Business Machine and Office Appliance Mechanics Conference Board, Local 459, etc., 2 Cir., 1955, 228 F.2d 553; 1 Leg.Hist. 942. See Farmer, Labor-Management Reporting and Disclosure Act of 1959, Interpretations and Implications: a symposium, 48 Geo.L.J. 327, 339.

As the Board pointed out the general statement in the Struck Work clause, standing alone, would be unlawful. It provides that the company will not render production assistance to any lithographic employer whose plant is struck by a local of the international union. But this, the Board says, is rendered legal by the implementation provision which follows and which provides that the employees covered by the contract shall not be required to handle any lithographic work farmed out directly or indirectly by any such employer, other than work the employer customarily has performed for the employer involved in the strike or lock-out.

We disagree with the Board that this removes the illegality. The implementation clause cannot be read so as to completely modify the general clause to mean nothing more than the implementation clause, and the language of the general clause far exceeds the "ally" exception.

We read Douds, and the Business Machine Conference Board case, supra, as limiting the "ally" doctrine to the farming out of struck work by one employer to another. It would appear to be a simple matter for the parties here to limit this clause to the language of the implementation portion thereof and to struck work, and thereby avoid the proscription of Section 8(e). It is a familiar rule that courts will not rewrite contracts for parties and we know of no authority for the Board to do so. We hold that the Struck Work clause as it is presently written is violative of the Act. The Right to Terminate clause, depending as it does on the validity of the Struck Work clause, falls with it.[11]

The Chain Shop clause was also found to be lawful by the Board as coming within the "single employer doctrine" which doctrine, like the "ally" doctrine, was not disturbed by the 1959 amendments. The purpose of this clause is undoubtedly to recognize the rights of employees to strike if employees in another lithographic plant of the same employer strike. International Brotherhood of Teamsters, etc. (Alexandria Warehouse & Sales Co.) 1960, 128 N.L.R.B. 916; and Dearborn Oil and Gas Corporation, 1959, 125 N.L.R.B. 645. In part it covers such a situation by providing that employees shall not be requested to handle work in its plant if in another lithographic plant which is wholly owned and controlled by the employer any local of the national union is on strike or locked-out. However, the clause also includes plants "commonly owned and controlled". The Board construed the language of this clause and said:

"* * * a strike at the plant of the contracting employer in sympa-

10. Two members of the Board dissented as to the validity of the three clauses here under consideration on the petition to modify.

11. In Brown v. Local No. 17, Amalgamated Lithographers of America, supra, the legality of a Struck Work clause asserted by another local of the International Union was considered and held invalid as needing further revision. We are considering a version revised to exclude from coverage work customarily performed for the employer involved in the strike. The Chain Shop clause there considered and found to be in need of further revision differs from the one here involved. The Trade Shop, Refusal to Handle and Termination clauses there considered and found invalid are substantially those here. The Separability clause apparently was not before that court.

thy with a strike at the plant of another company which is a separate legal entity is permitted, provided that, the two legal entities because of common control and ownership as the Board uses these terms, constitute a single employer within the meaning of the Act. Such a clause is therefore lawful."

The Board emphasized that centralized control of labor relations is a factor to be considered in finding common control of separate entities. To this we might add other factors, for example, common management, integrated operations and complete dependence of one company upon the other for its work. Suffice it to say however that in all events the single employer exception to the secondary boycott proscription runs only to those situations where because of conditions existing the two employers may and should be considered as one. J. G. Roy & Sons Co. v. N. L. R. B., 1 Cir., 1958, 251 F.2d 771; Bachman Machine Company v. N. L. R. B., 8 Cir., 1959, 266 F.2d 599.

The Chain Shop clause here is not so limited. It should contain the additional requirement that the employers constitute a single employer. The Board added this requirement but it was without warrant to do so. Like the Struck Work clause, this was not the language for which the union was striking. It is what the Board found it to mean. These constructions by the Board can stand only if they are warranted by the record and have a reasonable basis in law. N. L. R. B. v. Hearst Publications, 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170. They have neither. They must be set aside until rewritten within the limits of the "ally doctrine" and "single employer" doctrine presently existing and as herein defined. Then the Termination clause will be valid as well as that portion of the Refusal to Work clause which applies only to struck work.

And lastly we consider the petition to enforce. It is based on the finding of illegality by the Board of the Trade Shop and Refusal to Handle clause and the further finding that they were not saved from illegality by the separability clause. These clauses are as follow:

"TRADE SHOP

"Section 18. The parties agree that all the terms of this contract have been negotiated on the assumption that lithographic production work will be done under approved union wages and conditions. In the event the Company requests any employee to handle any lithographic production work made in any shop which was not under contract with the Amalgamated Lithographers of America and not authorized to use the union label of the Amalgamated, then the union in its discretion by notice in writing, may reopen the contract for negotiations as to the whole or any part thereof. In the event of failure to agree on all terms within 30 days after such reopening, the Union shall have the right to terminate the contract forthwith by giving written notice to the company.

"REFUSAL TO HANDLE

"Section 22. The Company agrees that it will not discharge, discipline or discriminate against any employee because such employee refuses to handle any lithographic production work which was made in a shop not under contract with the Amalgamated Lithographers of America or because such employee refuses to handle any struck lithographic work of the type described in paragraph 20."

"SEPARABILITY

"Section 23a. It is agreed that neither Section 18 (Trade Shop) or Section 22 (Refusal to Handle) shall be deemed effective or a part hereof unless and until it has been declared valid by the National Labor Relations Board or any Court having jurisdiction over the parties hereto. Upon being declared valid, the parties hereto agree to meet and nego-

tiate these provisions and upon reaching an agreement they shall become effective. In the event either of these provisions is held invalid by the National Labor Relations Board, then the parties agree to meet to negotiate substitute provisions therefor."

These clauses must be interpreted in the light of the legislative history of § 8(e) and the particular evils at which the legislation was aimed. Apex Hosiery Company v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311; N. L. R. B. v. Metallic Building Company, 5 Cir., 1953, 204 F.2d 826. It cannot now be doubted that Congress has banned agreements whereby an employer refrains or agrees, expressly or impliedly, to refrain from handling the work of another employer, and these clauses must be so tested.

We hold that the Trade Shop clause is an implied agreement within the meaning of the Act under which the employer is to refrain from handling or dealing in the product of other employers. The union urges that termination and re-negotiation is necessary because a request by the employer to handle non-union goods would create serious economic problems affecting the covered employees and even their pension fund but we agree with the Board that economic necessity cannot justify violation of the law. N. L. R. B. v. Hudson Motor Car Company, 6 Cir., 1942, 128 F.2d 528; N. L. R. B. v. Industrial Cotton Mill, 4 Cir., 1953, 208 F.2d 87, 45 A.L.R. 2d 880; and N. L. R. B. v. Harris, 5 Cir., 1953, 200 F.2d 656.

Under the Refusal to Handle clause, in pertinent part, the employer would bargain away his right to discharge or discipline an employee for refusing to handle lithographic production work made in a shop not under contract with the union. Thus, the employer would again violate § 8(e) in impliedly agreeing to cease and refrain from handling such work of the non-union employer. Cf. Local 1976, United Brotherhood of Carpenters, supra.

With considerable ingenuity counsel for the union asserts the Separability clause and argues that it operates to save these clauses even if they are illegal. However, the Board found and we agree that this clause did not render lawful the refusal to work overtime and the strike complained of by the Regional Director to force the employer to accept clauses which on their face contravene the provisions of § 8(e). Congress not only declared such clauses in contracts to be "unenforceable and void" but made it an unfair labor practice to "enter into" such agreements, using "signing" and "executing" interchangeably with "enter into" in the legislative history of the section. 2 Leg.Hist. pp. 1523, 1823, and 1857. A deferment clause of the type here involved would at least impair the effectiveness of the section and we read the Act as covering conditional as well as absolute "hot cargo" clauses. To demonstrate the weight of these clauses, resting as they do on the base of the separability clause, the alternatives to the employer are either abide the provisions of the clauses or face a reopening of the contract. Congress was aware of the weight of a threat to reopen. Representative Thompson speaking for himself and then Senator Kennedy pointed out:

"  *  *  *  It is very hard for a trucking firm either to resist the teamsters' demand for a hot cargo clause in collective bargaining when the price of resistance would undoubtedly be a strike for still higher wages, or to refuse to live up to the contract once it has signed it, when the cost of incompliance would undoubtedly be the teamsters' insistence that the contract has been terminated by the violation, thus freeing the union to bring new demands in collective bargaining." 2 Leg. Hist. 1708.

Thus, we hold that the Separability clause cannot and does not save these proposed agreements, forbidden as they were by the Congress, whether activated or in suspense.

We grant the petition to modify the order of the Board so as to accord with what we have said herein. As thus modified the petition to enforce is also

Granted.